**In re PUBLIC DEFENDER
SERVICE, Appellant.**

No. 03–SS–356.

District of Columbia Court of Appeals.

Argued June 23, 2003.
Decided Sept. 11, 2003.

Giovanna Shay, with whom James W. Klein, Julia Leighton, Samia Fam, and Timothy P. O'Toole were on the brief, for appellant.

Lisa H. Schertler, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese III, David Gorman, and Florence Pan, Assistant United States Attorneys, were on the brief, for the United States.

Before WAGNER, Chief Judge, and STEADMAN and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Attorneys are charged with two weighty responsibilities—to serve their clients with loyalty and zeal and to advance the administration of justice. To enable attorneys to fulfill these responsibilities, the law guarantees the confidentiality of legitimate attorney-client communications and enjoins attorneys entrusted with confidential communications to advise their clients to comply with the law. The privilege of confidentiality does not attach to attorney-client communications in furtherance of a crime or fraud, however. Nor does the attorney-client privilege protect the confidentiality of documents, otherwise discoverable, that the client furnishes to his attorney for the purpose of seeking legal advice. But the client may retain a limited Fifth Amendment privilege against self-incrimination in connection with the compelled production of such documents from the attorney. In that case, the government must grant the client use immunity for the act of produc-

tion in order to compel the attorney to produce the documents.

The present appeal, taken by the Public Defender Service ("PDS") after it was held in civil contempt for refusing to comply with a grand jury subpoena, requires us to apply these principles. Issued as part of an investigation into witness tampering by persons associated with a PDS client, the subpoena required PDS to produce any written statements in its possession that had been taken from the allegedly coerced witness and to reveal the client's confidential communications to his PDS attorney about those statements. The motions judge found the crime-fraud exception applicable and ordered the PDS attorney (who is not implicated in the alleged wrongdoing) to comply with the subpoena. The judge held PDS in contempt and imposed a sanction in order to permit it to take an immediate appeal of his ruling.

We reverse and vacate the order holding PDS in contempt. We hold that the government did not establish that the crime-fraud exception applied to the presumptively privileged attorney-client communications at issue, primarily because the government made no showing that those communications actually were in furtherance of an ongoing or future crime or fraud. Even if PDS's client himself delivered to his attorney a falsely exculpatory statement that the witness had been coerced into signing, for the purpose of enabling the attorney to use the statement to impeach the witness at the client's upcoming trial, there was no evidence that the illegal scheme was advanced; to the contrary, PDS has disavowed any intent to use the witness statement, for impeachment purposes or otherwise. The crime-fraud exception does not apply where the attorney talks the client out of committing the crime or fraud he contemplates or stops the client's scheme dead in its

tracks. This does not mean that PDS may refuse to produce the allegedly coerced witness statement itself, however. The attorney-client privilege does not shield the statement, nor does the work product doctrine. At most, given probable cause to believe that PDS's client transmitted a coerced witness statement (the fruit of a crime) to his attorney, the client may have a limited Fifth Amendment act of production privilege with respect to the statement. In the event the client asserts that privilege, its validity and effect may be addressed on remand.

## I.

Because this case involves ongoing grand jury proceedings, the record has been sealed and we limit our discussion of the facts to those necessary to our disposition of the appeal. *See (Emanuel) Davis v. United States*, 641 A.2d 484, 488 (D.C. 1994) (noting the importance of grand jury "policy of secrecy"). A PDS trial attorney ("Attorney") represents a defendant ("Client") on murder charges filed in Superior Court. Client has been held in the District of Columbia Jail pending trial (which had been set for April of 2003 but which has been held in abeyance to await the outcome of this appeal). A witness who has implicated Client in the murder ("Witness") also was being held at the Jail (on unrelated charges). During Witness's confinement there, in December 2002, inmates identified as Client's associates allegedly threatened Witness with a knife and forced him to write and sign two statements recanting what he had told the government about Client's involvement in the murder. The government learned of the incident and convened a grand jury to investigate it as obstruction of justice. On February 25, 2003, the grand jury issued a subpoena duces tecum directing Attorney to appear as a witness and to bring "[a]ny

statements or documents in your possession written or signed by [Witness], and any envelopes or other tangible evidence related to such statements or their origin." At PDS's request, the grand jury withdrew the subpoena to Attorney and substituted an otherwise identical subpoena directed to PDS.

PDS moved to quash the subpoena, primarily on the grounds that it called for information protected by the attorney-client privilege and the work product doctrine. In its opposition to PDS's motion to quash, the government argued that the crime-fraud exception vitiated any claim of privilege. The government stated that it "ha[d] information that individuals associated with [Client] coerced a potential witness (W–1) into writing a false statement concerning [Client's] pending murder case. The investigation also has revealed that [Attorney] visited W–1, made specific inquiries about a statement purportedly written by W–1, and implied that such a statement was in his possession."

Over PDS's objection, the government submitted an ex parte factual proffer in support of its opposition to the motion to quash. This proffer was signed by an Assistant United States Attorney but was unsworn and did not include any affidavits, grand jury testimony, or other evidence. The proffer recited that Client knew of Witness's cooperation with the prosecution against him, and it described in some detail, with references to corroborating evidence, how associates of Client had coerced Witness at the Jail into writing two falsely exculpatory statements for Client's benefit.[1] The proffer also reported that Client's attorney from PDS had subsequently interviewed Witness at the Jail in early February 2003 and asked him

whether he had been forced to write a statement. According to the proffer, Attorney implied to Witness that he had the statement in his possession by saying that he had "not brought it with him" to the Jail.

After holding two hearings on the issue, the motions judge declined to quash the grand jury subpoena. Overruling PDS's objection to the ex parte nature of the government's submission, the judge accepted the government's factual proffer and found it sufficient to trigger the crime-fraud exception to the attorney-client privilege. That exception, the judge stated, applied when "the client in question was committing or intending to commit a crime imminently and whe[n] the attorney/client communication[s] were in furtherance of that crime." The judge ordered PDS to produce to the grand jury any statement of Witness in its possession and held that Attorney would have to appear before the grand jury and answer "limited questions" about the origin of the statement and the circumstances under which it was obtained, including what Client had told him about the source of the statement. PDS asked the judge to review any statements of Witness in its possession in camera before determining whether the crime-fraud exception applied to them. The judge denied this request as well as PDS's request that he review in advance the specific questions that the grand jury proposed to ask Attorney.

In order to appeal, PDS informed the judge that it would instruct Attorney not to comply with the ruling. The judge held PDS in civil contempt, imposed a fine of one dollar for each day of non-compliance with the subpoena, and suspended execu-

---

1. The facts we repeat in this opinion have been revealed to PDS, either at the motion hearing or in a separate factual proffer that the government filed and served on PDS in connection with Client's murder trial.

tion of the monetary sanction pending the outcome of this appeal. *See In re Sealed Case (Synanon)*, 244 U.S.App. D.C. 11, 15, 754 F.2d 395, 399 (1985) ("An order in an ongoing proceeding to compel testimony or document production ordinarily is not appealable unless the party to whom it is addressed refuses to respond and is held in contempt."); *D.D. v. M.T.*, 550 A.2d 37, 42–43 (D.C.1988) ("[W]here the trial court has imposed no remedial or coercive sanction conditioned upon compliance with the contempt order, an adjudication of civil contempt lacks the certainty, specificity and finality essential for judicial review.").

## II.

The ultimate question that PDS raises in this appeal is whether the government made a sufficient showing to invoke the crime-fraud exception to the attorney-client privilege. To evaluate the sufficiency of the government's showing, we must address several antecedent issues, including the propriety of an ex parte presentation by the government; the standard of proof that the government must meet in its showing; what exactly must be shown for the crime-fraud exception to be established; and whether the showing in this case met the requirements.

Before we begin our analysis of these and other issues, a word is in order about the standard of review that we shall employ. The parties disagree over the appropriate standard of review in this case, and they each can cite cases to support their respective positions. PDS argues that our review in this case is de novo because the scope of the attorney-client privilege is predominantly a question of law. *See In re Grand Jury Proceeding Impounded*, 241 F.3d 308, 312 (3d Cir.2001); *In re*

*Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 858–59 (9th Cir.1991) [2]; *cf. In re Sealed Case*, 343 U.S.App. D.C. 103, 106–07, 223 F.3d 775, 778–79 (2000) (reviewing de novo where "the application of the crime-fraud exception turns on a pure question of law"). The government argues that a trial court's ruling concerning the application of the crime-fraud exception may be disturbed on appeal only for abuse of discretion. *See In re Grand Jury Subpoenas*, 144 F.3d 653, 659 (10th Cir.1998); *In re Grand Jury Proceedings, Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 348 (4th Cir.1994); *In re Sealed Case (Synanon)*, 244 U.S.App. D.C. at 15–16, 754 F.2d at 399–400; *United States v. Horvath*, 731 F.2d 557, 562 (8th Cir.1984); *In re Special Sept. 1978 Grand Jury (II)*, 640 F.2d 49, 59 (7th Cir.1980).

In our view, there is no "one size fits all" answer to this question. Rulings on claims of testimonial privilege typically involve intermingled questions of fact and of law. *See Littlejohn v. United States*, 705 A.2d 1077, 1082 (D.C.1997) (holding that ruling on invocation of self-incrimination privilege "may implicate questions both of fact and of law"). Nonetheless, here as in *Littlejohn*, the legal questions predominate. Our analysis of the validity of the ruling on privilege in this case does not turn on the correctness of purely factual determinations by the motions judge. The judge did not base his decision on an assessment of witness credibility or on findings of disputed historical facts; indeed, the judge heard no testimony and received no evidence other than the government's unsworn ex parte proffer (which is also before us). *Cf. Jones v. United States*, No. 828 A.2d 169, 173–74 (D.C.2003) (deferring to trial judge's ruling that attorney-client privilege

---

2. *But see In re Grand Jury Proceedings (Corporation)*, 87 F.3d 377, 380 (9th Cir.1996) (stating that standard of review for district court's

ruling that government established prima facie case of the crime-fraud exception was "an open question" in Ninth Circuit).

was waived when ruling was based on factual determination and credibility assessment).

Nor were the particular rulings we are asked to review committed in any significant degree to the motions judge's discretion. While trial court determinations on motions to quash typically are reviewed for abuse of discretion, *see United States v. Nixon*, 418 U.S. 683, 702, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the justification for that comparatively deferential standard of review is largely absent when the motion to quash is based on a claim of attorney-client privilege. Motions to quash on grounds other than privilege typically turn on fact-specific determinations of unreasonableness and oppressiveness, which are quintessentially discretionary judgment calls. *See* Super. Ct.Crim. R. 17(c). In making those determinations, the trial court "has the ability to choose from a range of permissible conclusions" and "can rely largely upon his own judgment in choosing among the alternatives." *Johnson v. United States*, 398 A.2d 354, 361 (D.C.1979). When the motion to quash is based on a claim of privilege, however, there is no such "range of permissible conclusions." *Id.* The recipient of the subpoena is either entitled to the protection of the privilege or not. *See Littlejohn*, 705 A.2d at 1082 n. 9 (rejecting view that a judge's ruling on a witness's claim of testimonial privilege is reviewable only for abuse of discretion). Thus, our analysis in this case must focus not on the motions judge's findings of fact or exercise of discretion, but on the correctness of the judge's legal conclusions—his statement of the applicable law and his determination that the government's proffer met the law's requirements.

It is the primary role of this court to articulate legal rules. "[W]here the matter under review requires invoca-

tion or declaration of a fact-free general principle of law, the court will designate the issue as a question of law, and review the matter 'de novo.'" *(Milton) Davis v. United States*, 564 A.2d 31, 35 (D.C.1989) (en banc). In the present case, therefore, we shall "apply the non-deferential *de novo* standard" to such legal questions as the scope and requirements of the crime-fraud exception, the burden and standard of proof, and the acceptability *vel non* of an ex parte proffer by the government to meet its burden. *Littlejohn*, 705 A.2d at 1082.

Whether the government made an adequate prima facie showing (accepting its proffer at face value) to support the crime fraud exception to the attorney client privilege is not a purely legal question. It aptly may be characterized as a "mixed question" of law and fact in which "the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard." *(Milton) Davis*, 564 A.2d at 35 (quoting *Pullman–Standard v. Swint*, 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982)). "There is no one standard of review that is uniformly applied to 'mixed questions,'" *id.*, but they normally are reviewed de novo when the legal aspects are dominant. *See, e.g., Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (holding that ultimate determinations of probable cause and reasonable suspicion in the Fourth Amendment context are mixed questions that should be reviewed de novo); *Littlejohn*, 705 A.2d at 1082 (holding the appropriateness of a witness's invocation of the privilege against self-incrimination to be a mixed question subject to de novo review). "In reviewing the trial court's resolution of a mixed question of fact and law, we consider, among other things, whether the issue to be decided

more closely resembles one of fact or of law, and whether the trial court or the appellate court is in a better position to render the decision with the higher degree of accuracy." *Id.* Since we are not called upon to assess the credibility of the government's proffer in this case, but only its sufficiency, such considerations persuade us that our review of that issue should be de novo.

### III.

#### A.

◼◼ The grand jury has "the ultimate responsibility to determine whether there is probable cause to believe a crime has been committed," and in aid of that function it has "extraordinary" investigative powers. *In re Antitrust Grand Jury,* 805 F.2d 155, 160 (6th Cir.1986); *see (Emanuel) Davis,* 641 A.2d at 488. The grand jury can "generally 'compel the production of evidence or testimony of witnesses'" through the issuance of subpoenas. *In re Grand Jury Subpoena,* 223 F.3d 213, 216 (3d Cir.2000) (quoting *United States v. Calandra,* 414 U.S. 338, 342–43, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)); *see* Super. Ct. Crim. R. 17.

◼ Attorneys possess no broad immunity from being called to testify in grand jury investigations. The grand jury even has the power to subpoena attorneys to testify against their clients, so long as the subject of the testimony is not privileged and the client's constitutional rights are not violated. *See In re Walsh,* 623 F.2d 489, 493 (7th Cir.1980); *see also United States v. R. Enterprises,* 498 U.S. 292, 297, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991). Nevertheless, such subpoenas do "implicate[ ] serious policy concerns." *In re Grand Jury Matters,* 751 F.2d 13, 18 (1st Cir.1984). Particularly when an attorney is representing the client in a pending

case, "the mere issuance of the subpoena may undermine the integrity of the attorney-client relationship." *In re Grand Jury Subpoena to Attorney (Under Seal),* 679 F.Supp. 1403, 1411 (N.D.W.Va.1988). "The very presence of the attorney in the grand jury room, even if only to assert valid privileges, can raise doubts in the client's mind as to his lawyer's unfettered devotion to his client's interests and thus impair or at least impinge upon the attorney-client relationship." *In re Grand Jury Investigation (Sturgis),* 412 F.Supp. 943, 946 (E.D.Pa.1976). The First Circuit has identified five adverse consequences of grand jury subpoenas to attorneys seeking evidence against their clients:

> [T]he serving of a grand jury subpoena on an attorney to compel evidence concerning a client may: 1) chill the relationship between lawyer and client; 2) create an immediate conflict of interest for the attorney/witness; 3) divert the attorney's time and resources away from his client; 4) discourage attorneys from providing representation in controversial criminal cases; and 5) force attorneys to withdraw as counsel because of ethical rules prohibiting an attorney from testifying against his client.

*Whitehouse v. United States Dist. Court,* 53 F.3d 1349, 1354 (1st Cir.1995). In a case such as this one, moreover, the impact of the grand jury subpoena on the attorney-client relationship may have constitutional ramifications, for the Sixth Amendment entitles the accused in a criminal prosecution to the effective assistance of counsel for his defense.

The Department of Justice recognizes the special concerns raised by attorney subpoenas. The Department's internal guidelines require the "[p]rior approval of the Assistant Attorney General of the Criminal Division ... before a grand jury subpoena may be issued to an attorney for

information relating to the representation of a client or the fees paid by such client." U.S. Attorney's Manual § 9–11.255. In determining whether the subpoena should issue, "the Assistant United States Attorney must strike a balance between an individual's right to the effective assistance of counsel and the public's interest in the fair administration of justice and effective law enforcement." U.S. Attorney's Manual § 9–13.410.

All this is simply to say that while a grand jury subpoena to an attorney may be perfectly proper, the fundamental interests at stake necessitate careful judicial scrutiny when the attorney asserts the attorney-client privilege and the government counters by invoking the crime-fraud exception.[3] To that scrutiny we now turn.

## B.

▄▄ The attorney-client privilege is "one of the oldest recognized privileges for confidential communications," *Swidler & Berlin v. United States,* 524 U.S. 399, 403, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998), and privileged communications are "traditionally deemed worthy of maximum legal protection." *Haines v. Liggett Group, Inc.,* 975 F.2d 81, 90 (3rd Cir.1992). The privilege derives from the recognition that "sound legal advice or advocacy serves

public ends...." *In re Ti.B.,* 762 A.2d 20, 28 (D.C.2000) (quoting *Martin v. Lauer,* 222 U.S.App. D.C. 302, 310, 686 F.2d 24, 32 (1982)). Lawyers cannot give sound legal advice without being apprised of "all pertinent facts, no matter how embarrassing or inculpating these facts may be." *Wesp v. Everson,* 33 P.3d 191, 196 (Colo.2001). Moreover, clients would be reluctant to share confidences "if their lawyers could be turned into witnesses against them or if they could be forced to disclose their conversations with their lawyers." *In re Sealed Case (Company),* 323 U.S.App. D.C. 233, 236, 107 F.3d 46, 49 (1997). By "encourag[ing] full and frank discussions between attorneys and their clients," the attorney-client privilege "promotes broader public interests in the observance of law and the administration of justice." *Ti.B.,* 762 A.2d at 27–28. "In the criminal context," moreover, "the privilege acquires Sixth Amendment protection." *Neku v. United States,* 620 A.2d 259, 262 (D.C. 1993).

▄▄ Underlying the attorney-client privilege is the premise that "the lawyer and the law office are indispensable parts of our administration of justice." *Hickman v. Taylor,* 329 U.S. 495, 515, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (Jackson, J., concurring). A lawyer's concurrent duties to his clients and to the administration of

---

**3.** The grand jury subpoena in this case was issued approximately two months before Client's murder trial was scheduled to commence, and we are informed that the government has moved to disqualify Attorney from representing Client at his trial in light of the motions judge's ruling requiring Attorney to reveal Client's communications about the allegedly coerced statements of Witness. We do not draw from these facts any inference whatsoever of prosecutorial overreaching or bad faith; none is claimed, nor is the issue before us. On rare occasions courts have quashed grand jury subpoenas to attorneys when the timing of the subpoena would interfere with the ongoing representation. *See In* *re Grand Jury Matters,* 751 F.2d at 19 (affirming district court's grant of motion to quash where timing of subpoenas was inappropriate, "without prejudice to the government's right to renew the subpoenas at a more suitable moment"); *cf. In re Grand Jury Subpoena (Reyes–Requena),* 913 F.2d 1118, 1128–29 (5th Cir.1990) (holding that district court did not abuse its discretion by quashing subpoena for oppressive timing, but remanding due to changed circumstances). We express no opinion on whether the timing of the grand jury subpoena in this case was unreasonable or oppressive such that the subpoena should have been quashed on grounds other than privilege. No such claim has been made.

justice require the lawyer "to advise clients so that they avoid any violation of the law in the proper exercise of their rights." D.C. R. of Prof'l Conduct 1.6, cmt. 1; *see also* D.C. R. of Prof'l Conduct 2.1; ABA Standards for Criminal Justice, *The Defense Function* § 3.7(a) (3d ed. 1993) ("It is defense counsel's duty to advise a client to comply with the law."). A lawyer's advice is important when clients honestly seek guidance as to their duties under complicated regulatory regimes, but it is even more vital when the client misguidedly contemplates or proposes actions that the client knows to be illegal. The existence of the attorney-client privilege encourages clients to make such unguarded and ill-advised suggestions to their lawyers. The lawyer is then obliged, in the interests of justice and the client's own long-term best interests, to urge the client, as forcefully and emphatically as necessary, to abandon illegal conduct or plans. *See* D.C. R. Prof'l Conduct § 3.3(b). The sincere counsel of a trusted advisor will persuade many clients to comply with the law. *See Purcell v. Dist. Attorney for the Suffolk Dist.*, 424 Mass. 109, 676 N.E.2d 436, 441 (1997) ("[A]n informed lawyer may be able to dissuade the client from improper future conduct ...."); D.C. R. Prof'l Conduct 1.6 cmt. 3 ("Based upon experience, lawyers know that almost all clients follow the advice given, and the law is upheld."). Indeed, discouraging clients from illegal conduct is a regular occurrence in an attorney's practice. "[A]bout half of the practice of a decent lawyer is telling would-be clients that they are damned fools and should stop." *McCandless v. Great Atlantic & Pacific Tea Co.*, 697 F.2d 198, 201–02 (7th Cir.1983) (attributed to Elihu Root).

 Thus, when clients contemplate presenting false evidence, lawyers are the first and most effective line of defense for the integrity of the judicial process. Particularly in criminal cases, where the defendant's liberty is in jeopardy, defendants may be tempted to falsify or embellish evidence. In such situations the defense lawyer's "first duty ... is to attempt to dissuade the client from the unlawful course of conduct." *Nix v. Whiteside*, 475 U.S. 157, 169, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). When a defendant proposes to offer his own perjured testimony, for example, the lawyer has an ethical duty to "make a good-faith effort to dissuade the client from testifying falsely." D.C. Bar Comm. on Legal Ethics, Op. No. 234; *accord*, ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 87–353 (1987). We believe that lawyers' efforts to prevent the introduction of false evidence are often successful, in part because the necessity of the lawyer's withdrawal will dissuade clients from pursuing plans to testify falsely. *See* D.C. R. Prof'l Conduct 3.3(b).

## IV.

 By encouraging clients to be open with their attorneys, the privilege of confidentiality for attorney-client communications is intended to enhance the ability of lawyers to dissuade their clients from committing frauds. The justification for the privilege evaporates when the attorney-client communication works to further a fraud instead of to prevent one. Hence it long has been the rule that "[a] client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law[; h]e must let the truth be told." *Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933). The crime-fraud exception to the attorney-client privilege "assure[s] that the seal of secrecy between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." *United States v. Zolin*, 491 U.S. 554, 563, 109 S.Ct.

2619, 105 L.Ed.2d 469 (1989) (internal citations and quotation marks omitted).

The instant appeal presents issues relating to both the procedure for establishing the crime-fraud exception and the substantive content of that exception. We shall address the procedure first, by considering the burden of proof, the type of evidence needed to satisfy that burden, and the permissibility of ex parte submission of that evidence to the court. We conclude that the government, as the party seeking to overcome the claim of privilege, has the burden of proof. To meet its burden the government must present the court with evidence showing probable cause to believe that the crime-fraud exception applies to the communications in question. Where the evidence on which the government relies is subject to grand jury secrecy, the government may proceed by ex parte submission. The government should, however, provide the court more than an unsworn narrative proffer by its attorney; an evidentiary submission, such as a sworn affidavit by a competent affiant, should be the norm.

Regarding the substantive content of the crime-fraud exception—what the government must show to establish the exception, in other words—we conclude that the exception applies to communications between client and attorney that are in furtherance of an ongoing or future crime or fraud. Communications that are merely about past wrongdoing do not trigger the exception. We reject the holding of some courts to the effect that the crime or fraud that is the subject of the communication must thereafter be completed for the exception to apply. That is too stringent a requirement. Broadly speaking, it is enough if the client uses the attorney's advice or services to pursue a crime or fraud, or if the attorney-client communication itself materially advances a crime or fraud, even

if the client's efforts are frustrated or halted short of consummation of the evil deed. However, an ill-motivated client communication that "goes nowhere"—as where the client consults an attorney with an evil purpose but the attorney quashes the venture before anything further is done to promote it—is not sufficiently in furtherance of a crime or fraud to fall within the crime-fraud exception.

We conclude that the government did not proffer sufficient facts in this case to establish the crime-fraud exception. The putative communications between Attorney and Client concerning the allegedly coerced statements of Witness therefore remain privileged and Attorney may not be forced to reveal those communications to the grand jury. As we shall go on to explain, however, our holding does not mean that PDS can invoke the attorney-client privilege (or the work product doctrine) to withhold the documents that the grand jury seeks, even if Client furnished those documents to PDS in connection with his representation. Subject to the possibility that Client may assert a valid Fifth Amendment act of production privilege with respect to them, those documents are susceptible to the grand jury's subpoena power.

## A.

■ The party asserting the attorney-client privilege has the burden of proving that communications are protected by that privilege. *In re Lindsey*, 332 U.S.App. D.C. 357, 364, 158 F.3d 1263, 1270 (1998). In this case, PDS satisfied the motions judge and the government that Attorney's conversations with Client about Witness and his statements are presumptively privileged; any such communications were made in confidence between a client and his legal advisor, they related to legal advice, and there is no indication of waiver.

*See Jones,* 828 A.2d at 175 (citing 8 WIG-MORE, EVIDENCE § 2292 (McNaughton rev.1961) for elements of attorney-client privilege). The point was not contested in the motions court. The privilege presumptively applies both to the verbal statements of Attorney and Client and, with a qualification to be noted below, to any documents conveyed by Client to Attorney for the purpose of securing legal advice. *See Haines,* 975 F.2d at 90.

A presumptively valid attorney-client privilege having been asserted, the burden was on the government, as the party seeking to overcome the privilege, to demonstrate the applicability of the crime-fraud exception. *See In re Sealed Case (Company),* 323 U.S.App.D.C. at 236, 107 F.3d at 49. In an early case the Supreme Court described the required showing as "prima facie evidence" that "give[s] colour to the charge" of a crime or fraud, *Clark,* 289 U.S. at 14, 53 S.Ct. 465 but the Court has not clarified what "prima facie evidence" means. *See Zolin,* 491 U.S. at 565 n. 7, 109 S.Ct. 2619 (acknowledging that its formulation in *Clark* "has caused some confusion," but not deciding what quantum of proof was needed to overcome the attorney-client privilege).[4]

"This *prima facie* showing of crime or fraud need not rise to the level of dispositive proof, but it must at least have some substance." *Crane v. Crane,* 614 A.2d 935, 941 (D.C.1992) (Terry, J., concurring). Although "[t]he government is not obliged to come forward with proof sufficient to establish the essential elements of a crime or fraud beyond a reasonable doubt, ... it isn't enough for the government merely to allege that it has a sneaking suspicion the client was engaging in or intending to engage in a crime or fraud when it consulted the attorney." *In re Grand Jury Proceedings (Corporation),* 87 F.3d 377, 381 (9th Cir.1996). Courts have described the government's burden in similar, if not necessarily equivalent, ways—speaking, for instance, of "probable cause to believe a crime or fraud has been committed,"[5] "evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud,"[6] "'reasonable cause to believe' that the attorney's services were 'utilized ... in furtherance of the ongoing unlawful scheme,'"[7] and "[evidence] such as will suffice until contradicted and overcome by other evidence."[8] Under any of these standards, the government must make a

---

4. As the D.C. Circuit has explained, "[t]he problem is" that the term "prima facie evidence"

 evokes the concept, familiar in civil litigation, of shifting the burden from one party to another. Yet it is altogether clear where the burden in these cases lies—on the party invoking the crime-fraud exception. In terms of the level of proof, is a "prima facie showing" a preponderance of the evidence, clear and convincing evidence, or something else?

 *In re Sealed Case (Company),* 323 U.S.App. D.C. at 236–37, 107 F.3d at 49–50.

5. *In re Richard Roe, Inc.,* 68 F.3d 38, 40 (2d Cir.1995). The Sixth Circuit has also adopted the probable cause standard. *See Antitrust Grand Jury,* 805 F.2d at 165–66.

6. *In re Sealed Case (Synanon),* 244 U.S.App. D.C. at 15, 754 F.2d at 399. Similar standards have been enunciated by the Third and Eleventh Circuits. *See Haines v. Liggett Group, Inc.,* 975 F.2d 81, 95–96 (3d Cir.1992); *In re Grand Jury Investigation (Schroeder),* 842 F.2d 1223, 1226 (11th Cir.1987).

7. *In re Grand Jury Proceedings (Corporation),* 87 F.3d 377, 381 (9th Cir.1996) (citing *In re Grand Jury Proceedings (Doe),* 867 F.2d 539, 541 (9th Cir.1989)).

8. *In re International Sys. & Controls Corp. Sec. Litig.,* 693 F.2d 1235, 1242 (5th Cir. 1982).

"specific showing" that the crime-fraud exception applies. *See In re BankAmerica Corp. Secs. Litig.,* 270 F.3d 639, 642 (8th Cir.2001).

■ A "probable cause" standard of proof balances the important interests at stake when a grand jury seeks disclosure of attorney-client communications. We do not believe that the attorney-client relationship should be invaded upon anything less than a showing of probable cause to believe that the communications fall within the crime-fraud exception. At the same time, we think that requiring a heightened showing—say, a showing by clear and convincing evidence—would be unrealistic and would interfere unduly with the grand jury's ability to obtain evidence. *Cf. United States v. Dionisio,* 410 U.S. 1, 17, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). A probable cause standard fairly balances the interests at stake and comports with the Supreme Court's mandate that the government's evidence "give colour to the charge." *Clark,* 289 U.S. at 15, 53 S.Ct. 465; *see Richard Roe,* 68 F.3d at 40; *In re Antitrust Grand Jury,* 805 F.2d at 166; *In re Subpoena Duces Tecum (Rich),* 731 F.2d 1032, 1039 (2d Cir.1984). We adopt "probable cause" as the test that must be met to establish the crime-fraud exception.

We borrow the probable cause standard from the Fourth Amendment and case law expounding on its meaning in that context. Adapted to the present context, the test for determining probable cause is whether the totality of the facts and circumstances presented would warrant a reasonable and prudent person in the belief that the attorney-client communications in question were in furtherance of an ongoing or future crime or fraud as explained in this opinion, *infra.* For further elaboration of the probable cause standard, see *(Dexter) Davis v. United States,* 781 A.2d 729, 734–35 (D.C.2001).

### B.

■ The motions judge based his decision on an ex parte factual proffer. PDS argues that it should have been allowed to have access to the contents of the proffer. The government responds that ex parte consideration was necessary because the proffer contained evidence presented to the grand jury. "[G]rand jury proceedings have traditionally been kept secret," *United States v. Alexander,* 428 A.2d 42, 53 (D.C.1981), and this seal of secrecy ensures the grand jury's "proper functioning." *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 218, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979).[9] In numerous cases, federal courts of appeals have

9. We reject PDS's claim that it was entitled to see the ex parte submission because PDS met the standards of particularized need that have been held to justify disclosure under Superior Court Criminal Rule 6(e). To establish a particularized need to overcome the presumptive secrecy of Rule 6(e), PDS had to "show that the material [it] seek[s] is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that [its] request is structured to cover only material so needed." *(Emanuel) Davis,* 641 A.2d at 490–91. PDS did not meet the first *Davis* criterion because it sought to use the grand jury material in the *same* proceeding, *i.e.,* to

quash the grand jury's subpoena. *See In re Antitrust Grand Jury,* 805 F.2d at 162. Moreover, PDS's "need for disclosure" was no greater than the need of other subpoena targets with a claim of privilege, for whom ex parte submissions have been approved. See cases cited *infra.*

As a practical matter, PDS was not materially disadvantaged in this case by not having access to the government's ex parte proffer. From other (public) sources, including a proffer that the government filed in Client's pending murder case, PDS was well apprised of the factual allegations that it needed to address.

held that the need to preserve grand jury secrecy allows a trial court to consider an ex parte submission of grand jury material proffered to establish the crime-fraud exception. *See In re Grand Jury Subpoena,* 223 F.3d 213, 219 (3d Cir.2000); *In re Grand Jury Subpoena as to C97–216,* 187 F.3d 996, 998 (8th Cir.1999); *In re Grand Jury Proceedings, Thursday Special Grand Jury Sept. Term, 1991,* 33 F.3d 342, 353 (4th Cir.1994); *In re Grand Jury Proceedings (Doe),* 867 F.2d 539, 540–41 (9th Cir.1989); *In re Antitrust Grand Jury,* 805 F.2d 155, 161–62 (6th Cir.1986); *In re Grand Jury Proceedings (Freeman),* 708 F.2d 1571, 1576 (11th Cir.1983); *In re John Doe Corp.,* 675 F.2d 482, 490 (2d Cir.1982); *In re Special Sept. 1978 Grand Jury (II),* 640 F.2d 49, 57 (7th Cir.1980); *see also In re Grand Jury Investigation (School),* 437 Mass.340, 772 N.E.2d 9, 22 (2002) (same).

 We agree with other courts that a trial court may consider a submission containing grand jury information ex parte. We stress, however, that the trial court should "vigorously test" any ex parte submissions. *In re Grand Jury Subpoena,* 223 F.3d at 219. We further note our concern about the nature of the proffer submitted by the government in this case. The proffer was simply an unsworn narrative statement signed by an Assistant United States Attorney rather than by an individual with personal knowledge of the facts set forth. It included no grand jury testimony, affidavits, documents, or comparable evidence. We appreciate, and do not discount, the fact that the Assistant United States Attorney who signed the proffer did so as an officer of the court and

was bound by professional standards. And we have no reason to think that the proffer was inaccurate or misleading. Still, given the interests at stake, we think that as a rule more should be required, especially when the submission is ex parte. When the government undertakes to demonstrate the applicability of the crime-fraud exception, it should do more than present its advocate's marshaling of facts gleaned from other sources; the government's burden is to present *evidence* upon which the trial court may find probable cause. *Cf. Nix. v. Cleveland,* 83 Ohio St.3d 379, 700 N.E.2d 12, 16–17 (1998) (holding that a party "failed to introduce sufficient, credible evidence to overcome the attorney-client privilege based on the crime-fraud exception" where the affidavits submitted to establish the exception were "replete with allegations based on belief and speculation rather than on personal knowledge"). In almost every case in which courts have approved ex parte submissions to establish the crime-fraud exception, the submissions have contained some direct evidence. *See, e.g., In re Grand Jury Subpoena,* 223 F.3d at 219 ("[T]he ex parte affidavit includes excerpts of witness testimony and documents obtained during the [grand jury] investigation.").[10] This evidence can take a variety of forms; affidavits based on personal knowledge, transcripts of grand jury proceedings or other testimony, and documentary evidence are all acceptable. But the government must present evidence to meet its burden.

### C.

Despite the foregoing concerns about the nature of the government's ex parte

---

**10.** *See also In re Antitrust Grand Jury,* 805 F.2d at 160 (ex parte submission of "a summary of grand jury testimony"); *In re Grand Jury Proceedings (Freeman),* 708 F.2d at 1573 (ex parte motion filed with "accompanying documents"); *In re John Doe Corp.,* 675 F.2d at 486 (ex parte submission of "grand jury

materials" included "testimony and documents"); *In re Special Sept. 1978 Grand Jury,* 640 F.2d at 54 (ex parte submission of exhibits); *In re Grand Jury Subpoena to Attorney (Under Seal),* 679 F.Supp. 1403, 1411 (N.D.W.Va.1988) (affidavit of law enforcement agent).

proffer, we do not decide the case on that ground, for there seems to be no real dispute over the accuracy of the material facts alleged in the proffer. We consider, therefore, whether those facts, taken at face value, were sufficient to meet the government's burden. This brings us to the question of the substantive content and requirements of the crime-fraud exception.

Statements of the crime-fraud exception vary, but the following formulation from the Restatement of the Law Governing Lawyers captures its essential elements:

> The attorney-client privilege does not apply to a communication occurring when a client:
>
> (a) consults a lawyer for the purpose, later accomplished, of obtaining assistance to engage in a crime or fraud or aiding a third person to do so, or
>
> (b) regardless of the client's purpose at the time of consultation, uses the lawyer's advice or other services to engage in or assist a crime or fraud.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 82 (2000).

To fall within the exception, therefore, the communication must "further a crime, fraud or other misconduct." *United States v. White,* 281 U.S.App. D.C. 39, 43, 887 F.2d 267, 271 (1989); *see Alexander v. United States,* 138 U.S. 353, 359–60, 11 S.Ct. 350, 34 L.Ed. 954 (1891); *In re Grand Jury Subpoena,* 223 F.3d 213, 217 (3d Cir.2000). "Only when communications are intended directly to advance a particular criminal or fraudulent endeavor[11] will their privileged status be forfeit-

ed by operation of th[e crime-fraud] exception." *In re Grand Jury Proceedings (Violette),* 183 F.3d 71, 77 (1st Cir.1999). "It does not suffice that the communications may be related to a crime," *White,* 281 U.S.App. D.C. at 43, 887 F.2d at 271, nor is it enough to show "temporal proximity between the communication and a crime." *In re Sealed Case (Company),* 323 U.S.App. D.C. at 237, 107 F.3d at 50. "[T]he court must determine that the communication was itself in furtherance of the crime or fraud, not merely that it has the potential of being relevant evidence of criminal or fraudulent activity." 1 JOHN W. STRONG, MCCORMICK ON EVIDENCE 382 (5th ed.1999).[12]

It is fundamental that the exception applies only to communications made to further ongoing or future crimes. *Zolin,* 491 U.S. at 562–63, 109 S.Ct. 2619; *In re Sealed Case (Synanon),* 244 U.S.App. D.C. at 18, 754 F.2d at 402. Communications "concerning past or completed crimes" are not affected by the crime-fraud exception. *In re Federal Grand Jury Proceedings 89–10,* 938 F.2d 1578, 1581 (11th Cir.1991).

Since communications with one's attorney about one's past crimes do not trigger the crime-fraud exception to the privilege, the government did not meet its burden of proof in the present case merely by furnishing probable cause to believe that Client was complicit in the alleged intimidation of Witness at the D.C. Jail in December 2002. Witness intimidation does constitute obstruction of justice, *see* D.C.Code § 22–722(a)(2) (2001), but this

---

11. Or when, as the Restatement points out, the client subsequently misuses the attorney's advice, regardless of the client's intent at the time of the communication.

12. However, an attorney's ignorance of his client's purpose to further a crime or fraud does not preclude the applicability of the crime-fraud exception. *See In re Sealed Case (Synanon),* 244 U.S.App. D.C. at 18, 754 F.2d at 402.

crime necessarily occurred before any communications between Attorney and Client about the statements allegedly procured from Witness through intimidation. The exception could only apply in this case if the communications were in furtherance of a future crime or fraud, namely Client's presumed plan to perpetrate a fraud on the court by giving Attorney a coerced statement with which to impeach Witness at trial. This future fraud never occurred, however, and there is no reason to think it ever will occur, as PDS has disavowed the use of any statement of Witness that was coerced. Moreover, the government proffered nothing to suggest that the alleged fraudulent scheme was either pursued after Client's communications with Attorney or materially advanced by the communications themselves. There is no suggestion whatsoever that Attorney did anything, even unwittingly, that was conducive to the fulfillment of the alleged scheme. To the contrary, the government's proffer stated only that Attorney undertook to investigate the bona fides of Witness's statement, which was responsible professional conduct on his part. Therefore, we must consider whether the crime-fraud exception requires the intended crime or fraud to have been completed, or if not completed, to have been pursued after the communication or materially advanced by the communication itself.

Some courts have concluded that the crime-fraud exception applies only when a crime or fraud has been completed. Notably, the D.C. Circuit has held that "the client must have made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act" and then "carried out the crime or fraud." *In re Sealed Case (Company)*, 323 U.S.App. D.C. at 236, 107 F.3d at 49. The court held that the exception does not apply to incomplete crimes or frauds "even though, at one time, the client had bad intentions." *Id.; see also Hewes v. Langston*, 853 So.2d 1237 (Miss.2003) (holding that the crime-fraud exception "requires proof that the crime or fraud actually occurred"). According to their commentary, the drafters of the crime-fraud exception in the Restatement of the Law Governing Lawyers agreed that it should not apply where the client does not "carry through" the intended unlawful act, albeit with the caveat that a criminal conspiracy or attempt that is "later frustrated" may fall within the exception:

A client could intend criminal or fraudulent conduct but not carry through the intended act. The exception should not apply in such circumstances, for it would penalize a client for doing what the privilege is designed to encourage—consulting a lawyer for the purpose of achieving law compliance. By the same token, lawyers might be discouraged from giving full and candid advice to clients about legally questionable courses of action. On the other hand, a client may consult a lawyer about a matter that constitutes a criminal conspiracy but that is later frustrated—and, in that sense, not later accomplished ... or, similarly, about a criminal attempt. Such a crime is within the [crime-fraud] exception ... if its elements are established.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 82 cmt. c (2000).

Other courts have reasoned that when a client intends an attorney consultation to further an illegal scheme, the attorney-client relationship has been abused regardless of the ultimate success of that scheme. These courts have held that "[t]he crime or fraud need not have occurred for the exception to be applicable" so long as the crime or fraud was "the objective of the client's communication." *In re Grand Jury*

*Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d 1032, 1039 (2d Cir.1984); *see also In re Grand Jury Proceedings (Corporation),* 87 F.3d 377, 381 (9th Cir. 1996) ("[The c]rime-fraud exception does not require a *completed* crime or fraud but only that the client have consulted the attorney in an *effort* to complete one." (emphasis in original)). A commentator has argued that the completion requirement is "unwise," because "[t]he attorney-client relationship is abused when the client seeks the advice with the intention of violating the law. The client's communications should not retroactively be afforded the protection of the privilege simply because he has changed his mind, or, worse yet, as a result of some fortuity, did not have an opportunity or was unable to accomplish his illegal ends." PAUL R. RICE, ATTORNEY–CLIENT PRIVILEGE IN THE UNITED STATES § 8:2 (2d ed.1999).

■ ■ We are not persuaded by the view that the crime-fraud exception requires that the intended crime or fraud be completed. The exception should be construed so as to effectuate and be "consistent with the purposes of the privilege." *Swidler & Berlin,* 524 U.S. at 409–10, 118 S.Ct. 2081. Those purposes do not include concealing abuses of the attorney-client relationship to further the commission of a crime or fraud. Such abuses may occur whether or not the crime or fraud is brought to fruition. We adhere to the view that the

exception applies so long as the attorney-client communications "further a crime, fraud or other misconduct." *White,* 281 U.S.App.D.C. at 43, 887 F.2d at 271.

What, then, is the content of the "furtherance" element of the crime-fraud exception? PDS suggests that the government must show a "further culpable act" occurring after the attorney-client communication. The government, on the other hand, urges that "[a] communication between client and attorney can be 'in furtherance of' the client's criminal conduct even if the attorney does nothing after the communication to assist the client's commission of a crime, and even though the communication turns out not to help (and perhaps even to hinder) the client's completion of a crime." *In re Grand Jury Proceedings (Corporation),* 87 F.3d at 382. The critical factor, the government contends, is simply "the client's intent to further a crime or fraud" when he communicates with his attorney. *In re BankAmerica Corp. Secs. Litig.,* 270 F.3d at 642.

We are not prepared to adopt either party's proposal precisely as stated. To begin with, we have considerable reservations about the government's position. We see little evidence that courts have applied the crime-fraud exception where attorneys successfully nullified their clients' bad intentions.[13] As we have ob-

---

13. Despite its dicta, quoted above, *Grand Jury Proceedings (Corporation)* dealt with a situation in which the corporate client continued its illegal conduct after it conferred with its counsel. *See* 87 F.3d at 382; *cf. In re BankAmerica Corp. Secs. Litig.,* 270 F.3d at 643–44 (although court of appeals found insufficient evidence to support district court's application of crime-fraud exception, the alleged violation of federal securities laws occurred after attorney-client communications at issue). Post-communication activity to carry out the crime or fraud is the rule in cases

applying the crime-fraud exception. *See, e.g., In re Grand Jury Proceedings (Violette),* 183 F.3d at 72 (false reports of disability were communicated to financial institutions by psychotherapists to whom communications were made); *United States v. Aucoin,* 964 F.2d 1492, 1495 (5th Cir.1992) (after communications, client used attorney's advice to obtain gambling records); *In re Antitrust Grand Jury,* 805 F.2d at 159–60 (alleged antitrust violations occurred after communications); *United States v. Sutton,* 732 F.2d 1483, 1494 (10th

served, counseling clients to obey the law lies at the core of an attorney's role in our legal system. Many clients will approach their lawyers with a genuine desire to conform their conduct with the law, but it would be pollyannaish not to recognize that some clients will not. Some clients inevitably will advance fraudulent or otherwise illegal proposals to their lawyers—the establishment of an illegal tax shelter, the evasion of a regulatory requirement, the withholding of evidence, the false embellishment of the client's testimony, and so on. Under the government's theory, all of these instances would fall immediately within the crime-fraud exception, regardless of whether the client abandoned his illegal proposal after receiving the advice of counsel. We do not believe the "precise focus" of the exception reaches so far. *White,* 281 U.S.App. D.C. at 43, 887 F.2d at 271. When an attorney dissuades or prevents his client from engaging in illegal conduct, the attorney-client relationship has not been abused; rather, the relationship has served the administration of justice by promoting legal conduct. *See In re Grand Jury Investigation (School),* 437 Mass.340, 772 N.E.2d 9, 21 (2002). Whatever the client's initial intentions, the attorney-client communication in such a case did not further the commission of a crime or fraud; it furthered obedience to the law. To withhold the privilege from such communications would be a mistake, for it effectively "would penalize a client for doing what the privilege is designed to encourage—consulting a lawyer for the purpose of achieving law compliance." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAW-YERS § 82 cmt. c; *accord, In re Sealed Case (Company),* 323 U.S.App. D.C. at 236, 107 F.3d at 49.

PDS's suggestion—that a "further culpable act" is necessary for the crime-fraud exception to apply—responds to our concern, but we are not satisfied with PDS's phrasing. "Culpable" may be taken to imply that the furthering act has to be fraudulent or criminal in and of itself, which we think is not required; the exception should operate, for example, where the attorney is duped into unwittingly facilitating the client's unlawful scheme. In addition, a strict "further culpable act" requirement might exclude certain special cases in which, we think, the attorney-client privilege is appropriately forfeited *ab initio* because the communication itself advances a crime or fraud—as where the attorney agrees to help the client carry out his illegal scheme instead of rejecting it outright. *See United States v. Gordon–Nikkar,* 518 F.2d 972, 975 (5th Cir.1975). In this respect, we prefer the Restatement formulation that the crime-fraud exception is applicable where a client "consults a lawyer for the purpose, later accomplished, of obtaining assistance to engage in a crime or fraud." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 82(a). Under this formulation the privilege is lost once the client obtains from his lawyer the assistance he seeks to commit a crime or fraud. But the privilege is not lost where the lawyer refuses such assistance and the criminal or fraudulent plan is abandoned or stopped in its tracks.

Cir.1984) (exception applied to conversation about client's plan to destroy documents where client later destroyed documents); *In re John Doe Corp.,* 675 F.2d at 491 (exception applied where communications were used to cover up criminal scheme); *United States v. Ruhbayan,* 201 F.Supp.2d 682, 684 (E.D.Va. 2002) (perjured witness testimony occurred after communications); *United States v. Morales–Martinez,* 672 F.Supp. 762, 765 (D.Vt. 1987) (false passport was offered as evidence after communications).

We conclude that it is not enough for the proponent of the crime-fraud exception to demonstrate probable cause to believe only that the client consulted a lawyer for the purpose of obtaining assistance to engage in a crime or fraud. The proponent must present evidence that the consultation furthered the client's improper purpose. The burden is not a heavy one. The government does not have to show that the intended crime or fraud was accomplished, only that the lawyer's advice or other services were misused. Typically that can be shown by evidence of some activity following the improper consultation, on the part of either the client or the lawyer, to advance the intended crime or fraud.

■■■ In the present case, the facts in the government's proffer demonstrated probable cause to believe that Client knew Witness had been coerced into making false statements for Client's benefit at his upcoming murder trial and that Client or someone acting on his behalf had conveyed those statements to Attorney. One can fairly infer that if Client communicated with Attorney about Witness's statements, it was probably for the purpose of obtaining Attorney's assistance in perpetrating a fraud.

The government did not show probable cause to believe that Client's communication with Attorney furthered his improper purpose, however. To the contrary, Client was stymied; Attorney did not cooperate in Client's plan and instead renounced it. The government proffered nothing to show that Client or Attorney did anything to advance Client's fraudulent plan after they conferred. Attorney's conversation with Witness cannot be characterized as such an act, nor does the government attempt to do so. On its face the purpose of the interview was to fulfill defense counsel's duty to investigate the alleged intimidation of a key government witness against his client. *See Wiggins v. Smith,* —— U.S. ——, —— – ——, 123 S.Ct. 2527, 2536–37, 156 L.Ed.2d 471 (2003) (finding ineffective assistance of counsel where defense counsel failed to conduct "the requisite, diligent investigation"); *Williams v. Taylor,* 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (same); *see also* ABA Standards for Criminal Justice, *The Defense Function* § 4.1(a) (3d ed. 1993) ("Defense counsel should ... explore all avenues leading to facts relevant to the merits of the case.") The necessity of this investigation is underscored by the government's announced intention to introduce evidence of the intimidation at Client's murder trial to demonstrate his consciousness of guilt. *See Crutchfield v. United States,* 779 A.2d 307, 323 (D.C.2001). Our holding might be different if Attorney had expressed an intent to use Witness's statement to impeach him; then one could infer that Client's communications with Attorney furthered his planned fraud. The facts in the proffer do not permit any such inference, however.

This is not a case, therefore, in which "the attorney-client privilege has become unworthy of protection." *State v. Philip Morris, Inc.,* 606 N.W.2d 676, 691 (Minn. Ct.App.2000). So far as appears, it is a case in which the attorney did not allow his client to misuse their relationship. We conclude that the government has not carried its burden to demonstrate the applicability of the crime-fraud exception to Attorney's communications with Client about the statements of Witness.

V.

■■■ Because the government has failed to prove the applicability of the crime-fraud exception, Client's conversations with Attorney about Witness's statements are protected by the attorney-client privilege. Therefore the grand jury may not require Attorney to testify as to those

conversations. However, if (as we are given to understand) Attorney has in his possession any written statements taken from Witness by third parties (Client's alleged associates),[14] those statements are amenable to subpoena by the grand jury, subject to the possibility that Client has a valid Fifth Amendment privilege to assert for the act of production.

■ Since the statements the grand jury seeks—statements allegedly extracted from a witness by force—constitute evidence of a possible obstruction of justice, there is no issue regarding the grand jury's legitimate and substantial need for the documents. The statements are not protected attorney work product because they were not prepared by Attorney or his agents. "[T]he work product doctrine protects any document prepared in anticipation of litigation *by or for the attorney*." *In re Antitrust Grand Jury*, 805 F.2d at 163 (emphasis added); *see Hickman v. Taylor*, 329 U.S. 495, 509–14, 67 S.Ct. 385, 91 L.Ed. 451 (1947). "[T]he principle underlying the work product doctrine—sheltering the mental processes of an attorney

as reflected in documents prepared for litigation—is not generally promoted by shielding from discovery materials in an attorney's possession *that were prepared neither by the attorney nor his agents*." *In re Grand Jury Subpoenas (Mercator)*, 318 F.3d 379, 384 (2d Cir.2003) (emphasis added).[15]

■ It is true, as we have mentioned earlier, that the attorney-client privilege does extend to documents that a client provides his attorney in connection with obtaining legal advice.[16] *See Fisher v. United States*, 425 U.S. 391, 404, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). However, the attorney-client privilege does not afford any greater protection for such documents than they would have if they were still in the client's own possession. *See id.* at 403–04, 96 S.Ct. 1569. It follows that Attorney and PDS can withhold statements of Witness from the grand jury only if their compelled production directly from Client would violate Client's own privilege against self-incrimination. *See In re Grand Jury Proceedings (Bayird)*, 41 F.3d 377, 379 (8th Cir.1994) ("When material

14. Although PDS has not expressly admitted possessing such statements, it has not denied possessing them either, and we draw the strong inference of possession from that fact combined with the government's undisputed proffer.

15. It should be noted that our discussion does not apply to statements, if any exist, taken from Witness by PDS employees as part of proper defense investigation on Client's behalf. We presume that such statements would be protected from grand jury subpoena under the attorney work product doctrine. Since PDS has not claimed work product protection for such statements (leading to the inference that none exist), and since the government has not mentioned them either, the issue is not part of this appeal. If PDS does have properly taken statements from Witness, it can so advise the motions judge on remand; and if there exists any question about them, the judge can examine them *in camera* to

determine whether they are protected work product.

16. PDS has neither admitted nor denied that Client was involved in furnishing statements of Witness to Attorney, but that has been the implicit premise of the motion to quash, and we proceed on the assumption that he did. If not—if someone other than Client transmitted the statements to Attorney without Client's involvement—that probably is an end of the matter. It is unlikely that Attorney then would have a colorable basis to withhold the statements from the grand jury (or to refuse to testify as to their source either). There are many possible variations on this theme, however, and we shall not speculate in a vacuum or rule out potential legal arguments in advance of any knowledge of the facts. We therefore content ourselves with expounding on the general principles that apply in this area.

has been transferred from a client to an attorney for the purpose of seeking legal advice and the subpoena is directed to the attorney, the proper inquiry is whether the subpoena, if directed to the client himself, would require compelled testimonial self-incrimination."); *In re Grand Jury Proceedings on February 4, 1982 (Terry)*, 759 F.2d 1418, 1420 (9th Cir.1985).

 The privilege against self-incrimination "is limited to prohibiting the use of 'physical or moral compulsion' exerted on the person asserting the privilege." *Fisher*, 425 U.S. at 397, 96 S.Ct. 1569 (quoting *Perlman v. United States*, 247 U.S. 7, 15, 38 S.Ct. 417, 62 L.Ed. 950 (1918)). Documents that are prepared voluntarily or by a third party are not "compelled" for purposes of the privilege. *See id.* "[A] person may be required to produce specific documents even though they contain incriminating assertions of fact or belief because the creation of those documents was not 'compelled' within the meaning of the privilege." *United States v. Hubbell*, 530 U.S. 27, 35–36, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000); *see Baltimore City Dep't of Soc. Servs. v. Bouknight*, 493 U.S. 549, 555, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990).

 Although Client therefore cannot assert a Fifth Amendment privilege as to the contents of Witness's statements, "the act of production itself may implicitly communicate statements of fact." *Hubbell*, 530 U.S. at 36, 120 S.Ct. 2037 (internal quotation marks and citations omitted); *United States v. Doe*, 465 U.S. 605, 612, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984). "A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect." *Id.* That is, "by producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession

or control, and were authentic." *Hubbell*, 530 U.S. at 37 n. 19, 120 S.Ct. 2037. If such admissions genuinely would be incriminating, the holder of the documents would have a limited Fifth Amendment privilege with respect to the act of production. When an individual has an act of production privilege for a document, the government may not compel him to produce that document without giving the individual immunity for the act of production. *See Doe*, 465 U.S. at 617, 104 S.Ct. 1237. Because the grant of immunity "need be only as broad as the privilege against self-incrimination ... any grant of use immunity need only protect [the target] from the self-incrimination that might accompany the act of producing [the requested documents.]" *Id.* at 617 n. 17, 104 S.Ct. 1237; *see also In re J.W.O.*, 940 F.2d 1165, 1167 (8th Cir.1991) (holding that where government has granted act of production immunity, subpoena target must turn over records).

 Even where the contents of a subpoenaed document may be incriminating, the act of production privilege is not automatic. The act of production privilege does not apply if the existence, possession, and authenticity of a document is a "foregone conclusion," as would be the case if the act of production "adds little or nothing to the sum total of the Government's information." *Fisher*, 425 U.S. at 411, 96 S.Ct. 1569; *see Marchetti v. United States*, 390 U.S. 39, 53, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) (holding that self-incrimination privilege applies only when individual is "confronted by substantial and real, and not merely trifling or imaginary, hazards of incrimination"). Determining the existence of an act of production privilege is a fact-specific inquiry, which turns on the "facts and circumstances of particular cases or classes thereof." *Doe*, 465 U.S. at

613, 104 S.Ct. 1237 (quoting *Fisher,* 425 U.S. at 410, 96 S.Ct. 1569).

■ On the facts of this case, Client may have an act of production privilege with respect to statements of Witness in Attorney's possession. That is not because producing the statements in response to the subpoena would admit their existence or authenticity. That would "add[ ] little or nothing to the sum total of the Government's information," *Fisher,* 425 U.S. at 411, 96 S.Ct. 1569, because the government already knows the statements exist and Witness doubtless can authenticate his signed writings himself. Admitting possession of the statements, on the other hand, could be incriminatory, because it would link Client to the alleged witness intimidation.

The issue is not for us to resolve in this appeal. PDS did argue in its motion to quash that Client had an act of production privilege as to any statements of Witness in Attorney's possession, but the motions judge, having ruled against the predicate claim of attorney-client privilege, did not reach the Fifth Amendment question. If Client asserts an act of production privilege on remand, and the government contests it, it will be up to the motions judge to perform the "fact-intensive" analysis necessary to determine whether producing the statements called for by the grand jury subpoena would be incriminating.[17] *See In re Foster,* 188 F.3d 1259, 1270 (10th Cir.1999) (remanding for factual findings on the applicability of the act of production privilege where the bankruptcy court failed to create "a record or fact-specific analysis" bearing on the claim). In conducting this analysis, the judge would consider whether the disclosure of

the documents in PDS's possession would have testimonial aspects, whether those aspects have an incriminatory effect, and whether the risk of incrimination is "substantial and real." *See Marchetti,* 390 U.S. at 53, 88 S.Ct. 697. Consideration of these issues might be aided by in camera review of the documents in question. *See Foster,* 188 F.3d at 1270; *Antitrust Grand Jury,* 805 F.2d at 168–69.

## VI.

For the above reasons, we vacate the trial court's contempt adjudication and remand for further proceedings consistent with this opinion.

*So ordered.*

---

17. The grand jury also subpoenaed "any envelopes or other tangible evidence related to such statements or their origin." The parties have not addressed this aspect of the subpoe-

na, and it is not clear that any such "tangible evidence" exists. If it does, the same or similar considerations will apply.