**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2475
_____

IN RE: GRAND JURY MATTER #3

John Doe,
Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 2:14-gj-631-3)
District Judge: Honorable R. Barclay Surrick
_____

Argued: January 12, 2016

Before: McKEE, *Chief Judge[1]*, AMBRO and SCIRICA,
*Circuit Judges*

(Opinion filed: October 28, 2016)
_____

SCOTT A. RESNIK, ESQUIRE (Argued)
MICHAEL M. ROSENSAFT, ESQUIRE
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022

---

[1] Judge McKee was Chief Judge at the time this appeal was argued. Judge Mckee concluded his term as Chief Judge of the United States Court of Appeals for the Third Circuit on September 30, 2016.

KARL S. MYERS, ESQUIRE
ANDREW K. STUTZMAN, ESQUIRE
Stradley, Ronan, Stevens & Young
2005 Market Street
Suite 2600
Philadelphia, PA  19103

*Counsel for Appellant*

MARK B. DUBNOFF, ESQUIRE (Argued)
JOEL M. SWEET, ESQUIRE
Office of the United States Attorney
615 Chestnut St., Suite 1250
Philadelphia, PA 19106

*Counsel for Appellee*

McKEE, *Chief Judge*.

Company A, John Doe 1, John Doe 1's lawyer, and John Doe 2 are the subjects of an ongoing grand jury investigation into an allegedly fraudulent business scheme.[2] John Doe 1 brought this appeal after the government obtained access to an email he claimed was privileged. Before presenting the email in question to the grand jury, the government asked the district court for permission to do so. The district court granted permission, finding that although the email was protected by the work product privilege, the crime-fraud exception to that doctrine applied. John Doe 1 then filed an interlocutory appeal, requesting that our Court reverse the district court's order.

On January 12, 2016, when we heard oral argument in this case, the grand jury had not yet issued any indictments. However, while this appeal was still pending, the district court permitted the grand jury to view the email in question.

[2] We use pseudonyms to refer to the grand jury subjects to protect the secrecy of the grand jury investigation and the anonymity of the subjects.

On March 31, 2016, the grand jury returned a seventeen-count indictment, charging John Doe 1, John Doe 1's lawyer, and John Doe 2 with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, conspiracy, mail fraud, wire fraud, and money laundering. For the reasons that follow, we hold that we do not have jurisdiction to hear the present appeal.

## I.

### A. *John Doe 1, John Doe 2, and Company A*

Company A, John Doe 1, and John Doe 2 were subjects of an ongoing grand jury investigation that sought to determine whether they and others undertook fraudulent business transactions in order to launder money and settle lawsuits under false pretenses. Company A was incorporated in Florida in 2008. John Doe 1 was the president and the "sole proprietor" of that company.[3] Nonetheless, a November 2008 document purports to memorialize John Doe 1's sale of one hundred percent of the shares of Company A to a corporation we will call Company B for $10,000. John Doe 2 is the sole owner of Company B. Following this purchase agreement, John Doe 1 claims that John Doe 2 engaged John Doe 1 and his associates to be responsible for Company A's day-to-day operations. However, numerous filings and tax documents suggested that John Doe 1 maintained control and ownership of Company A even after Company A was purportedly transferred.

Since at least 2000, multiple individuals have sued John Doe 1 and his businesses in state courts around the country based on John Doe 1's business practices. One such lawsuit was a class action filed against Company A in Indiana state court. In this class action, the plaintiffs alleged that Company A's business practices violated various Indiana state laws. They sought to hold John Doe 1 accountable for these violations. However, during this litigation, John Doe 1 averred in a deposition that he had transferred ownership of Company A to Company B. John Doe 2 then represented that

---

[3] January J.A. at 6, 32.

3

Company A was no longer in business and had limited assets. Shortly after John Doe 1's deposition, the Indiana plaintiffs settled their lawsuit for approximately $260,000, about ten percent of the value that attorneys for the plaintiffs had put on the lawsuit.

B. *District Court Grand Jury Proceedings & Interlocutory Appeal*

Thereafter, the government empaneled a grand jury to investigate John Does 1 and 2. In the course of this investigation, a grand jury subpoena was sent to John Doe 1's accountant requesting that he provide the government with John Doe 1's personal and corporate tax returns. Among other things, these tax documents revealed that John Doe 1 had claimed one hundred percent ownership of Company A every tax year from 2008 through 2012. The accountant also told an IRS agent that, at some point in 2013, John Doe 1's lawyer informed him that John Doe 1 had sold Company A to John Doe 2 in 2008. He also informed investigators that he might have taken notes on this conversation. The government requested those notes, and the accountant's attorney sent the government three documents.

One of these documents was an email John Doe 1 had sent to the accountant on July 16, 2013, forwarding an email that John Doe 1's lawyer had sent to John Doe 1 four days earlier. The contents of this email could be read to incriminate John Doe 1, John Doe 1's lawyer, and John Doe 2. The email instructs John Doe 1 of the steps he should take to correct his records so that they reflect that John Doe 2, not John Doe 1, owned Company A since 2008. When John Doe 1 forwarded this email to his accountant, he simply wrote: "Please see the seventh paragraph down re; my tax returns. Then we can discuss this." Thus, the email can be interpreted as evidence of John Does 1 and 2's fraudulent scheme.

The day after the accountant provided this email to the government, the accountant's attorney sought to recall it on the ground that it was privileged and had been inadvertently included in his client's production. The accountant's counsel, however, also told the government that his client believed the email was asking the accountant to perform an accounting

4

service, not a legal service. The government argued that under such circumstances, John Doe 1 waived any privilege that might have otherwise attached to his lawyer's email. Nonetheless, based on this dispute, the government temporarily refrained from presenting the email to the grand jury. Instead, the government moved for permission to show the email on January 23, 2015. John Doe 1 opposed this motion.

The district court ruled that the government could present the email to the grand jury on June 1, 2015. As the district court explained in its memorandum opinion, John Doe 1 did not forward this email to his accountant to seek legal advice or obtain such advice. Accordingly, his forwarding of the email destroyed the attorney-client privilege attached to this document. Nevertheless, the district court did find that the work-product privilege attached to the email because the accountant could not be considered an adversary. The court then concluded that the crime-fraud exception to the work-product privilege applied. On this basis, the court permitted the government to present the email to the grand jury.

Immediately after the district court handed down its decision, John Doe 1 filed an interlocutory appeal, requesting that we reverse this order. We heard oral argument on January 12, 2016. While the appeal to our Court was pending, however, the grand jury returned a seventeen-count indictment charging John Doe 1, his lawyer, and John Doe 2, with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, conspiracy, mail fraud, wire fraud, and money laundering.

After this indictment, we requested supplemental briefing from the parties on whether this appeal was moot in light of the indictment. We also asked the government to inform us whether the grand jury had been discharged.

In response, the government explained that the grand jury had been discharged shortly after it returned the indictment. However, the government also informed us that a new grand jury has been empaneled and is investigating new charges against John Doe 1 and others. The government is also considering a superseding indictment. The government

5

has informed us that if it seeks a superseding indictment from the newly empaneled grand jury, it will present the disputed email to the grand jury in support of charges that would be contained in the superseding indictment. Accordingly, both John Doe 1 and the government agree that the appeal is not moot due to the continuing investigation.

Nonetheless, the government now contends that we lack jurisdiction over this appeal under *In re Grand Jury Proceedings*, 631 F.2d 1033 (3d Cir. 1980). John Doe disagrees. For the following reasons, we agree with the government and hold that we lack jurisdiction over this appeal.

## II.

This appeal presents a complicated and novel procedural fact pattern, which complicates the issue of our jurisdiction. Nonetheless, as we shall explain, we conclude that we lack jurisdiction over this appeal.[4] This conclusion is guided, in part, by the decisions of our sister circuits, which have dealt with cases more analogous to the present appeal.

A. *The Finality Rule*

"[T]he right to a judgment from more than one court is a matter of grace and not a necessary ingredient of justice."[5] Congress has determined that courts of appeals shall only have jurisdiction over "final decisions" of the district courts.[6] As our Court has acknowledged, two attributes ordinarily define a final decision. "'First, the decision will fully resolve all claims presented to the district court. Second, after the decision has been issued, there will be nothing further for the district court to do.'"[7] Thus, "[w]hen a district court orders a

---

[4] The district court had jurisdiction over this case pursuant to 18 U.S.C. § 3231.

[5] *Cobbledick v. United States*, 309 U.S. 323, 325 (1940).

[6] 28 U.S.C. § 1291.

[7] *In re Grand Jury*, 705 F.3d 133, 142 (3d Cir. 2012) (quoting *Aluminum Co. of Am. v. Beazer East, Inc.*, 124 F.3d 551, 557

witness—whether a party to an underlying litigation, a subject or target of a grand jury investigation, or a complete stranger to the proceedings—to testify or produce documents, its order generally is not considered an immediately appealable final decision under § 1291."[8] Therefore, disclosure orders are generally not final and cannot normally be challenged by an immediate, *i.e.* interlocutory, appeal.

Three considerations generally justify this finality requirement. First, the finality rule "helps preserve the respect due trial judges."[9] "Permitting piecemeal appeals would undermine the independence of the district judge, as well as the special role [they] play[] in our judicial system."[10] Second, this requirement "minimizes a party's opportunities to defeat the valid claims of his opponents through an endless barrage of appeals."[11] As Justice Frankfurter once explained, the finality rule "avoid[s] the obstruction to just claims that would come from permitting the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise, from its initiation to entry of judgment."[12] Lastly and relatedly, the rule promotes efficiency by removing obstacles that would otherwise impede judicial process. "To be effective, judicial administration must not be leaden-footed. Its momentum would be arrested by permitting separate reviews of the component elements in a unified cause."[13]

---

(3d Cir. 1997) (citing *Catlin v. United States*, 324 U.S. 229, 233 (1945))).

[8] *Id.* (internal alterations and quotation marks omitted) (citing *United States v. Ryan*, 402 U.S. 530, 532-34 (1971), *Cobbledick*, 309 U.S. at 326-29, and *Alexander v. United States*, 201 U.S. 117, 118-22 (1906)).

[9] *Flanagan v. United States*, 465 U.S. 259, 263 (1984).

[10] *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981).

[11] *In re Grand Jury Subpoena*, 190 F.3d 375, 379 (5th Cir. 1999).

[12] *Cobbledick*, 309 U.S. at 325.

[13] *Id.*

These concerns are especially robust in criminal cases.[14] As the Supreme Court has emphasized, "the delays and disruptions attendant upon intermediate appeal are especially inimical to the effective and fair administration of the criminal law."[15] The particular importance of the finality requirement to criminal cases flows both from the accused's Sixth Amendment right to as well as from society's independent interest in a speedy trial:

> As time passes, the prosecution's ability to meet its burden of proof may greatly diminish: evidence and witnesses may disappear, and testimony becomes more easily impeachable as the events recounted become more remote. Delay increases the cost of pretrial detention and extends "the period during which defendants released on bail may commit other crimes." Delay between arrest and punishment prolongs public anxiety over community safety if a person accused of a serious crime is free on bail. It may also adversely affect the prospects for rehabilitation. Finally, when a crime is committed against a community, the community has a strong collective psychological and moral interest in swiftly bringing the person responsible to justice. Prompt acquittal of a person wrongly accused, which forces prosecutorial investigation to continue, is as important as prompt conviction and sentence of a person rightly accused. Crime inflicts a wound on the community, and that

---

[14] *See United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 265 (1982) ("This Court has long held that [the doctrine of finality] . . . is inimical to piecemeal appellate review of trial court decisions which do not terminate the litigation, and that this policy is at its strongest in the field of criminal law . . . ."); *Cobbledick*, 309 U.S. at 325 ("These considerations of policy are especially compelling in the administration of criminal justice.").

[15] *DiBella v. United States*, 369 U.S. 121, 126 (1962).

wound may not begin to heal until criminal proceedings have come to an end.[16]

As a result, the finality rule takes on particular importance in criminal adjudications.

### B. *The Contempt Rule*

To obtain immediate appellate review of a disclosure order, the order's target must ordinarily comply with what is known as the "contempt rule": He "must refuse compliance, be held in contempt, and then appeal the contempt order."[17] The party may immediately appeal the district court's contempt order because that order is a final judgment imposing penalties on the willfully disobedient party in what is effectively a separate proceeding.[18]

The contempt route "is a firmly established feature of federal appellate procedure, . . . but the decision to travel that route must not be made lightly."[19] The rule, "though at times a harsh one, was formulated to discourage appeals in all but the most serious cases."[20] Requiring a person who objects to a disclosure order to "'refuse to comply, be subjected to sanctions in contempt, and then appeal from the sanctions . . . [,] puts the objecting person's sincerity to the test by attaching a price to the demand for immediate review.'"[21]

---

[16] *Flanagan v. United States*, 465 U.S. 259, 264-65 (1984) (quoting *United States v. MacDonald*, 435 U.S. 850, 862 (1978) and citing *Barker v. Wingo*, 407 U.S. 514, 520 (1972)).

[17] *Church of Scientology v. United States*, 506 U.S. 9, 18 n.11 (1992) (citing *United States v. Ryan*, 402 U.S. 530 (1971)); *see also Cobbledick*, 309 U.S. at 326-29; *Alexander v. United States*, 201 U.S. 117, 118-22 (1906).

[18] *In re Grand Jury*, 705 F.3d 133, 143 (3d Cir. 2012).

[19] *Id.*

[20] *In re Grand Jury Proceedings*, 604 F.2d 798, 800 (3d Cir. 1979).

[21] *In re Grand Jury*, 705 F.3d at 143 (alteration in original) (quoting *Wilson v. O'Brien*, 621 F.3d 641, 643 (7th Cir. 2010)).

## C. *The* Perlman *Exception to the Contempt Rule*

Nevertheless, an exception to this contempt rule does exist for a limited class of parties. In *Perlman v. United States*,[22] the Supreme Court declined to apply the contempt rule to a party who did not have control over the target of the district court's disclosure order. That case centered on the seized exhibits of a patent holder, Louis Perlman. These exhibits first came into the possession of a district court when Perlman testified on behalf of his company in a patent infringement trial.[23] When the company moved to dismiss its suit without prejudice, the district court granted the company's motion. Nonetheless, it ordered the court clerk to impound the exhibits Perlman used during his testimony and to maintain them under seal.[24] Soon after this infringement suit ended, the government initiated a grand jury investigation of Perlman, suspecting that he had committed perjury during the patent trial.[25] To assist in the investigation, the government sought an order from the district court directing the court clerk to produce the exhibits Perlman used during his testimony.[26] Perlman objected, claiming that such use of his exhibits would constitute an unreasonable search and seizure and render him a compulsory witness against himself in violation of the Fourth and Fifth Amendments.[27] The district court disagreed with Perlman and ordered the clerk to produce the exhibits to the government.[28]

Perlman then appealed to the Supreme Court. There, the government argued that the district court's disclosure order was not appealable.[29] The Supreme Court disagreed. The Court reasoned that because "Perlman was powerless to avert the mischief," he should not be required to "accept its

---

[22] 247 U.S. 7 (1918).

[23] *Id.* at 8.

[24] *Id.* at 8-9.

[25] *Id.* at 9-10.

[26] *Id.*

[27] *Id.* at 10, 13.

[28] *Id.* at 10-11.

[29] *Id.* at 12.

incidence and seek a remedy at some other time and in some other way."[30] In other words, because the exhibits were not in his possession, he could not refuse to produce them, standing in contempt to obtain an immediate appeal. Because the contempt route was unavailable to him, he was "powerless to avert the mischief" of their production.[31]

As our Court has explained, "though the *Perlman* doctrine's reach has not been set precisely by the Supreme Court, it generally permits an interlocutory appeal of a disclosure order if [that order] is directed at a disinterested third party lacking a sufficient stake in the proceeding to risk contempt by refusing compliance."[32] In such a circumstance, the privilege holder is permitted to appeal immediately without suffering contempt sanctions. Because the privilege holder himself cannot disobey the disclosure order and the third party at whom the disclosure order is directed is unlikely to do so on his behalf, the privilege holder is permitted an immediate appeal.[33]

Despite the general acceptance of the *Perlman* exception, the Supreme Court clarified in 2009 that disclosure orders averse to the attorney-client privilege do not qualify for immediate appeal under the collateral order doctrine. After the Supreme Court handed down *Mohawk Industries, Inc. v. Carpenter*,[34] appellate courts grappled with the question of whether and to what extent *Mohawk* narrowed the *Perlman* exception.

---

[30] *Id.* at 13.

[31] *Id.*

[32] *In re Grand Jury*, 705 F.3d at 144 (citing *Church of Scientology*, 506 U.S. at 18 n.11 and *United States v. Nixon*, 418 U.S. 683, 691 (1974)).

[33] *See id.*; *In re Grand Jury Empanelled Aug. 14, 1979*, 638 F.2d 1235, 1237 (3d Cir. 1981); *In re Grand Jury Applicants*, 619 F.2d 1022, 1025 (3d Cir. 1980); *In re Grand Jury Proceedings*, 604 F.2d 798, 800-01 (3d Cir. 1979).

[34] 558 U.S. 100, 112 (2009); *see also Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949).

For our part, we declined "to hold that the Supreme Court narrowed the *Perlman* doctrine—at least in the grand jury context—*sub silentio.*"[35] As we noted in *In re Grand Jury*,

> the *Mohawk* Court gave no clear indication that [overruling *Perlman*] was a consequence of its intended holding. It did not discuss, mention, or even cite *Perlman,* a fact that is not that surprising given that the *Perlman* doctrine and the collateral order doctrine recognize separate exceptions to the general rule of finality under § 1291.[36]

Therefore, we concluded that "the *Perlman* exception remains viable."[37]

D. *Application of the* Perlman *Exception to the Present Appeal*

The *Perlman* exception generally applies to disclosure orders only when they are directed at *disinterested* third parties who lack sufficient stake in the proceedings to risk contempt.[38] Examples of such disinterested third parties include former counsel[39] or court clerks.[40] However, where current counsel or employees hold the targeted documents, we have held that the party claiming the privilege can take possession of those documents, refuse to comply with a subpoena, and invite the sanction of contempt, which would then afford an avenue for appeal.[41]

In the present appeal, John Doe 1's accountant was an agent of John Doe 1. Therefore, John Doe 1 could have taken possession of the email in question and risked contempt sanctions himself. However, before he had the opportunity to

---

[35] *In re Grand Jury*, 705 F.3d at 145.

[36] *Id.* at 46.

[37] *Id.*

[38] *Id.* at 144.

[39] *Id.* at 148.

[40] *Perlman v. United States*, 247 U.S. 7, 12-13 (1918).

[41] *In re Grand Jury*, 705 F.3d at 148.

take such an action, the accountant produced the email in question to the government. Therefore, this appeal presents a slightly different fact pattern than the normal *Perlman* exception. John Doe was not stripped of the opportunity to stand in contempt of the district court's order by some disinterested third party; rather, his own agent's error led to this result. Therefore, it is not clear that, given the opportunity to seize the email in question, John Doe 1 would have been willing to stand in contempt of this order. He did not have to pay the price normally exacted in exchange for immediate review.[42]

Two other courts of appeals have already examined the question of whether a party's inadvertent production of privileged documents disqualifies it from seeking the *Perlman* exception's protection; they reached different results. First, in *In re Grand Jury Investigation of Ocean Transportation*,[43] the D.C. Circuit held that the *Perlman* exception applied to an inadvertent production of documents that the party's former counsel specifically marked "privileged." In the course of its investigation into Sea-Land Services, the Antitrust Division of the United States Department of Justice sought certain records from the company.[44] In August 1976, the district court issued a subpoena to Sea-Land, and Sea-Land instructed its counsel to withhold from production all documents that might be covered by the attorney-client privilege.[45] In response, the company's attorney marked certain privileged documents with a "P." Nonetheless, counsel turned over both these marked documents as well as non-marked documents to the government.[46] Because counsel turned over Sea-Land's documents contrary to Sea-Land's express instructions, the D.C. Circuit held that the *Perlman* exception applied.[47]

---

[42] *See Wilson v. O'Brien*, 621 F.3d 641, 643 (7th Cir. 2010).

[43] 604 F.2d 672 (D.C. Cir. 1979) (per curiam).

[44] *Id.* at 673.

[45] *Id.* at 674.

[46] *Id.*

[47] *Id.* at 673.

The second appellate court decision regarding the *Perlman* exception's applicability to inadvertently produced documents is more akin to the present appeal. In *In re Grand Jury Subpoena*,[48] the Fifth Circuit distinguished *Ocean Transportation* and held that a party's inadvertent production of documents did not fall under the *Perlman* exception. There, the corporate appellant produced approximately 5000 documents in response to a subpoena.[49] After this production, the appellant learned that a document that was marked privileged was handed over as part of this production dump.[50] But the Fifth Circuit held that the *Perlman* exception did not apply to this document. As that court explained, "[t]his is not a case where a disinterested third party controlled the fate of the documents disclosed, nor is it a case where the documents were stolen or seized."[51] The court reasoned the appellants "themselves controlled the fate of the documents at issue," and, therefore, "the criminal justice system should not be made to bear the brunt of their inadequate precautions."[52]

The Fifth Circuit decision is instructive for one other reason. The district court had also engaged in a procedural misstep related to the in camera review of other documents.[53] District courts often review documents in camera to assess whether they must be produced to the opposing party. If a court determines that documents should be produced, it must order the party to whom the documents belong to produce them to its adversary. The owner of the documents can obtain immediate appellate review of such an order by refusing to hand over the documents and standing in contempt of the district court's order. In the Fifth Circuit case, however, the district court itself made the documents available to the government following the in camera review, thereby robbing

---

[48] 190 F.3d 375, 385-87 (5th Cir. 1999).

[49] *Id.* at 377.

[50] *Id.*

[51] *Id.* at 386 (citing *Perlman v. United States*, 247 U.S. 7, 10 (1918) & *In re Grand Jury Proceedings Involving Berkley and Co.*, 629 F.2d 548, 550 (8th Cir. 1980)).

[52] *Id.*

[53] *Id.* at 387-88.

the appellants of the contempt route.[54] The corporate appellants urged the Fifth Circuit to work around the district court's procedural misstep by "applying the *Perlman* exception and collateral order doctrine to determine jurisdiction."[55] The Fifth Circuit declined this invitation, explaining that "employing that approach in this case would plunge us into the very difficult issue of deciding whether, in determining if the acts Corporate Appellants are alleged to have committed even constitute a crime for purposes of applying the crime-fraud exception."[56] The Fifth Circuit found it improper to "reach[] the merits of a secret, ongoing grand jury investigation."[57] Therefore, the court decided against the work-around the appellants requested. Instead, the court chose to correct this procedural flaw by granting mandamus and ordering the district court to return the documents to the appellants so that they had the option of standing in contempt of court.[58]

Such a writ would have also been acceptable in the present appeal, before the grand jury had a chance to view the email and issue its indictment. Had the email been returned to John Doe 1, and then ordered produced, John Doe 1 would have had the option to stand in contempt of court, testing his willingness to produce the email in question. Because John Doe 1 did not obtain such a writ, we must decide whether the *Perlman* exception applies.

The purpose of the *Perlman* doctrine is to protect defendants from the government using privileged documents before a grand jury. It is necessary because, in situations where the doctrine applies, defendants are unable to subject themselves to the contempt of court that would ordinarily grant them standing to challenge the disclosure. In *Perlman*, the Court stated "Perlman contends that the *proposed* use by the United States before the grand jury *of the exhibits as a basis for an indictment against him* constitutes an

---

[54] *Id.*

[55] *Id.* at 388.

[56] *Id.* at 388-89.

[57] *Id.* at 389.

[58] *Id.*

15

unreasonable seizure . . . ."[59] The purpose of the doctrine, therefore, is to protect against the use of privileged documents "as a basis for an indictment." Accordingly, where, as here, an indictment is returned that relies upon purportedly privileged documents, the doctrine's purpose is no longer served.

At least one other court of appeals is in accord. In *United States v. Calandra*,[60] the Court of Appeals for the Seventh Circuit explained that "[i]t is the possibility of disclosure of information which is thought to be confidential that is central to the *Perlman* exception."[61] There, the information at issue had also already been disclosed to government agents. As a result, the Seventh Circuit reasoned that there was no need for immediate appellate review[62]: Disclosure of information confounds the very purpose of the *Perlman* exception. As *Calandra* explained,

> In the event that the present trial results in a conviction, this jurisdictional ruling on the interlocutory appeal does not foreclose raising the privilege issue again on direct appeal. It obviously would then be too late to retrieve the alleged privileged testimony from further exposure, but not too late to consider its impact, if any, upon the conviction.[63]

Similarly, the disclosure of the email to the grand jury prior to the indictment here undermines the very purpose of the *Perlman* exception. The grand jury has already seen the email at issue in this appeal. Deciding now that the disclosure of that email was improper will not repair the breach of confidentiality that already occurred: The jurors cannot un-see that email any more than the proverbial bell can be un-

---

[59] *Perlman v. United States*, 247 U.S. 7, 13 (1918) (emphases added).

[60] 706 F.2d 225 (7th Cir. 1983).

[61] *Id.* at 228.

[62] *Id.*

[63] *Id.*

16

rung. Therefore, in this case, immediate appeal is not required under *Perlman*.

E. *Application of the Collateral Order Doctrine to the Present Appeal*

We find that the March indictment sufficiently tips the scales such that we do not have jurisdiction over this appeal pursuant to the collateral order doctrine. Reviewing Supreme Court and appellate court precedent on interlocutory appeals, two relevant principles become evident. First, and most importantly, where an appellant will have an opportunity for later review of his claims, the law disfavors interlocutory appeals. The Supreme Court has repeatedly emphasized that interlocutory appeals should only be accepted in "the limited class of cases where denial of immediate review would render impossible any review whatsoever of an individual's claims."[64]

Similarly, we have held that interlocutory appeals during grand jury proceedings are inappropriate where appellants will have later opportunities to appeal the purportedly flawed grand jury proceedings. In *In re Grand Jury Proceedings (Johanson)*,[65] our Court held that we did not have jurisdiction under the collateral order doctrine to hear an appeal of a district court order denying an evidentiary hearing. That appeal arose from multidistrict litigation investigating the Abscam scandal. After the press identified Louis C. Johanson as the target of the pending Abscam investigation, Johanson moved the district court to hold an evidentiary hearing to determine which federal employees released this confidential information.[66] Johanson stated that he sought their identities so that he could move to disqualify them from participating in the grand jury proceedings in his case (his theory was that their participation in these proceedings would violate his Fifth Amendment right to an impartial grand jury).[67]

---

[64] *United States v. Ryan*, 402 U.S. 530, 533 (1971).
[65] 632 F.2d 1033 (3d Cir. 1980).
[66] *Id.* at 1035-36.
[67] *Id.* at 1036-37.

Nonetheless, the district court denied Johanson's motion and allowed the grand jury investigation to proceed. Johanson then appealed the district court's denial of his motion for an evidentiary hearing to our court and requested that we stay the grand jury proceedings to prevent his being indicted before resolution of his appeal.[68] We refused to grant a stay of the grand jury proceedings, declining "to interrupt the grand jury's investigation or to delay its decision."[69] The grand jury then returned an indictment against Johanson before we were able to rule on his appeal.[70]

When we did issue our decision, after Johanson's indictment, we determined that we no longer had jurisdiction to rule on Johanson's appeal of district court's denial of his motion for an evidentiary hearing.[71] Although we acknowledged that the grand jury proceedings in Johanson's case may have been flawed, we recognized that any such flaws could be corrected on appeal after his trial, if he was convicted.

> [F]lawed grand jury proceedings can be effectively reviewed by this court and remedied after a conviction has been entered and all criminal proceedings have been terminated in the district court. Because delayed appellate review will not irreparably deny Johanson his right to an impartial grand jury (his conviction could be reversed if at a later stage we conclude the grand jury was tainted), the order is not reviewable immediately as a collateral order.[72]

Because the indictment of Johanson had already issued, and, therefore, the criminal trial was "fairly in train,"[73] we found

---

[68] *Id.* at 1038.

[69] *Id.*

[70] *Id.*

[71] *Id.* at 1039-40.

[72] *Id.* (citing *Costello v. United States*, 350 U.S. 359 (1955)).

[73] *Di Bella v. United States*, 369 U.S. 121, 131 (1962).

18

that we no longer had the requisite jurisdiction to hear his appeal of the evidentiary hearing motion.

The same logic applies here. Any flaw in the grand jury proceedings stemming from the disclosure of the email can be corrected on appeal if the appellants are convicted. In this case, John Doe 1 will have another opportunity to seek review of his claim. If he does not take a plea agreement, he will face trial, whether on the indictment that issued in March or on a superseding indictment that issues in the near future.[74] Therefore, "the criminal trial is [] fairly in train," and John Doe 1's appeal here is "truly interlocutory."[75] A party "is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error at any stage of the litigation may be ventilated."[76] John Doe 1 is asking us to peek into the merits of his case to determine whether the crime-fraud exception applies. But he can go to trial—whether on this indictment or the next—and, if convicted, appeal this email issue. The collateral order doctrine simply does not give us jurisdiction in such circumstances.

In response to this point, the Dissent argues that our holding undermines judicial efficiency.[77] As a general matter, we agree with our dissenting colleague that "in cases where we accept an appeal when it is filed, efficiency favors

---

[74] Moreover, even if John Doe 1 were to decide that a guilty plea was in his best interest, he could still seek to preserve his right to appeal this issue by tendering a conditional guilty plea. We know of nothing that would suggest such an offer would be rejected by the government or by the district court. Of course, we note this only as part of our academic discussion of finality and jurisdiction. We in no way intend to suggest anything about the merits of the prosecution or the propriety of any course of action that the appellant may wish to pursue.

[75] *Id.*

[76] *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994).

[77] Dissent at 9-11.

finishing what we started."[78] However, we do not agree that this general principle applies to the novel circumstances of this appeal.

The Dissent is correct that there is a possibility that this matter could someday return to us on appeal, which could result in some duplication of effort. However, the Dissent fails to acknowledge that there is also a possibility that John Doe 1 will neither be convicted at trial nor accept a plea agreement. In either event, John Doe 1 would no longer have reason to appeal the purported breach of privilege, and the case would not return to us. Moreover, though a newly empaneled jury continues to investigate John Doe 1, we can only speculate as to whether that proceeding will implicate the contested email or trigger another appeal on the same grounds. In the Dissent's own words, the Government "*may make further use of the email that Doe is asking us to keep confidential.*"[79]

Basing our exercise of jurisdiction on a mere possibility that this case will return to us, or on the chance that the document will be used to support additional charges, would open the door to numerous interlocutory challenges. This is precisely the sort of fractured "leaden-footed[ness]"[80] that the finality rule seeks to prevent. The Dissent's approach would also create line-drawing problems: How strong of a possibility is sufficient to create jurisdiction, and how do we quantify that possibility?  In our view, where a question can just as well be answered after a final ruling, and, indeed, may no longer require an answer at that time, the efficient path is to not arrest the momentum of trial court proceedings.

The Dissent also argues that our position conflicts with two of our prior cases.[81] In response to our discussion of

---

[78] *Id.* at 10.

[79] *Id.* at 4 (emphasis added).

[80] *Cobbledick v. United States*, 309 U.S. 323, 325 (1940).

[81] The Dissent also explains that it would reverse the district court and conclude that the crime-fraud exception to the attorney work product doctrine does not apply to the email at issue. Dissent at 11-15. We express no opinion on the merits

*Johanson*, the Dissent points out that the government's investigation of John Doe 1, his lawyer, and John Doe 2 is ongoing.[82] The government has notified our Court that it has empaneled a new grand jury that is "continuing to investigate unindicted persons, and considering whether additional charges should be brought against persons already indicted."[83] Although the existence of this ongoing investigation does slightly distinguish this case from Johanson's, it does not undermine the applicability of *Johanson* to this appeal or create a difference. A new grand jury is *considering* a superseding indictment. This new indictment has not yet come to fruition. But if it does not, the government will go forward with the indictment it has already secured. The government has not suggested that it intends to dismiss the current indictment and every indication is to the contrary. Therefore, this case will go to trial (barring any plea agreement), either on the existing indictment or on a superseding indictment. Accordingly, the logic of *Johanson* applies, removing our jurisdiction over this appeal.

In addition, the Dissent claims that *In re Search of Elec. Commc'ns in the Account of chakafattah@gmail.com at Internet Serv. Provider Google, Inc.* ("*Fattah*") undercuts our position.[84] There, while under investigation by a grand jury, Congressman Chaka Fattah filed an appeal contesting a warrant to search his email account. We held that we had jurisdiction under *Perlman* despite the fact that an indictment had issued before our decision.[85] We also held that the collateral order rule did not apply. We reasoned that it did not apply, in part, because we found that the district court's order denying Fattah's motion to quash the search warrant was not effectively unreviewable on appeal.[86] According to the Dissent, *Fattah* is a prime example of how in a single case, post-proceedings review can be sufficient under the collateral

---

because we find that we do not have jurisdiction over this appeal.
[82] *Id.* at 4.
[83] Gov't May Br. at 1.
[84] 802 F.3d 516 (3d Cir. 2015).
[85] *Id.* at 521 n.2, 529-30.
[86] *Id.* at 525-26.

order rule yet immediate appeal is still warranted under *Perlman*.[87]

However, a crucial fact distinguishes *Fattah* from the present appeal: the grand jury in that case *never had access to the documents at issue*.[88] Here, the email has already been produced, the grand jury has already seen it, and it has returned an indictment—no doubt at least partly because of that email. Therefore, while the grand jury proceedings in *Fattah* had not been tainted by the document disclosure, the grand jury proceedings in this case potentially have. Whether this email should have been allowed to reach the grand jury, and, if not, whether it tainted the proceedings can just as easily be decided in a direct and final appeal of conviction (should the appellants be convicted) as in this interlocutory appeal. Therefore, because a party "is entitled to a single appeal,"[89] we must wait for that final appeal to speak on the email disclosure issue.[90]

Here, the damage of disclosure has already been done, and considerations of finality and judicial efficiency dictate that we wait until the final appeal from conviction, should one occur, to decide the email issue. Should a jury convict the appellants, they will certainly have another, equally adequate,

---

[87] Dissent at 7.

[88] *Fattah*, 802 F.3d at 521, 531.

[89] *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994).

[90] The Dissent also suggests that we have jurisdiction because we retained jurisdiction pursuant to *Perlman* over a similar appeal in *In re Grand Jury (ABC Corp.)*, 705 F.3d 133 (2012). Dissent at 8. However, we are unpersuaded for the same reasons we are not convinced by the Dissent's reliance on *Fattah*. In *ABC Corp.*, the district court ordered disclosure of certain documents, and the targets of the grand jury investigation appealed. At the appellants' request, we stayed the disclosure order. *ABC Corp.*, 705 F.3d at 140-42, 148. Thus, in *ABC Corp.*, as in *Fattah*, the grand jury had not yet seen the documents, and exercising jurisdiction pursuant to *Perlman* could prevent potential harm. That is not the case here.

opportunity to present their privilege claims. Under the circumstances here, we hold that we lack jurisdiction to address this interlocutory appeal.

*In re Grand Jury Matter No. 3*
No. 15-2475

_____

AMBRO, <u>Circuit Judge</u>, dissenting

My colleagues concede the possibility that we had jurisdiction at the beginning of this appeal but conclude that we lost it after John Doe 1 ("Doe") was indicted. In my view, this fails to follow two of our previous decisions where we exercised post-indictment jurisdiction. Moreover, even if we were writing on a clean slate, I am concerned that the majority undermines the very efficiency interests it seeks to promote. Finally, our dismissal of Doe's appeal leaves in place, at least for now, a decision on the merits that unduly erodes the protection of the attorney work product doctrine. I therefore respectfully dissent.

**I.**

Because Doe's criminal case has not yet proceeded to a final judgment, my colleagues conclude that his appeal is premature. However, this is not the typical instance of a court telling a litigant he has appealed too soon. That is because my colleagues do not conclude that the appeal was premature at the time it was filed. Rather, they leave open the possibility that, prior to the indictment, the Supreme Court's decision in *Perlman v. United States*, 247 U.S. 7 (1918), provided us with jurisdiction.[1] What they fail to explain is how an appeal, like

---

[1] There is no need to leave that question unresolved. *Perlman* certainly provided jurisdiction at the beginning of the case. As discussed later in this opinion, *Perlman* applies when a "disinterested" third party controls a privilege holder's documents and is ordered to produce them. *See In re Grand*

Benjamin Button, can age in reverse, losing the maturity it previously had.

---

*Jury (ABC Corp.)*, 705 F.3d 133, 138 (3d Cir. 2012). The email at issue here was produced in response to a subpoena addressed to Doe's accountant. My colleagues suggest that he would have been disinterested if he had been Doe's former accountant at the time of the subpoena. However, because Doe still employed him at that time, they say he was not disinterested. They are nonetheless willing to posit the possibility that *Perlman* applied, but only because the accountant inadvertently produced the email. Maj. Op. at 14–15. They derive the proposition that an appellant's current agents are not disinterested (whereas his former agents are) from our decision in *ABC Corp.* However, as Judge Vanaskie noted in his partial dissent in that case, the majority opinion did not address that question. 705 F.3d at 166 (Vanaskie, J., dissenting in part). As he persuasively explained, it does not make sense to distinguish between current and former agents, and the "majority of . . . circuits that have addressed this issue" do not make such a distinction. *Id.* at 166–67. Indeed, we have previously applied *Perlman* to a subpoena addressed to an accounting company without asking whether it was a current or former agent. *See Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 671 F.2d 100, 103 (3d Cir. 1982). Rather than relying on a current/former dichotomy, what we instead held in *ABC Corp.* is that *Perlman* does not apply when an appellant and his agents are jointly subject to a court order mandating disclosure. 705 F.3d at 138 (majority opinion). Because Doe was never a party to the subpoena addressed to his accountant, this was a *Perlman* case even before the inadvertent production.

2

On at least two occasions we have continued to exercise jurisdiction even after grand juries returned indictments. The majority's approach conflicts with both of those prior cases. In the first case, the Government appealed an adverse ruling on a grand jury subpoena. At the outset of the appeal, our jurisdiction was clear because Congress had specifically given the Government the right to seek immediate review. *See In re Grand Jury Proceedings (Johanson)*, 632 F.2d 1033, 1040 (3d Cir. 1980) (citing 18 U.S.C. § 3731). As the appeal was pending, however, the grand jury returned an indictment. We nonetheless concluded that, as long as the indictment did not render the appeal moot, we had jurisdiction to reach the merits. Because in that case the indictment "did not bring the grand jury's proceedings to [their] conclusion," a live controversy remained and our jurisdiction was intact. *Id.*[2]

The second decision, which involved Congressman Chaka Fattah and was issued just last year, is even more compelling because it, like our case, arose under *Perlman*. At the time Fattah filed his *Perlman* appeal, he was, like Doe, being investigated by a grand jury. Just as in our case, his status changed when the grand jury, after oral arguments in our Court but before we reached a decision, returned an indictment. *See In re Search of Elec. Commc'ns in the Account of chakafattah@gmail.com at Internet Serv. Provider Google, Inc.*, 802 F.3d 516, 521 n.2 (3d Cir. 2015) ("*Fattah*"). However, because his appeal related to the still-ongoing review of his emails (thus giving us a live

---

[2] My colleagues rely on our discussion in *Johanson* of a separate appeal that was filed by the target of the grand jury investigation. As I discuss below, however, this has no bearing on Doe's appeal.

3

controversy), we continued to exercise *Perlman* jurisdiction even after the indictment. *Id.* at 529–30.

To be sure, an intervening indictment can (and often will) moot a grand jury appeal. For instance, Doe through this appeal asks us to prevent the grand jury from relying on an email that he says is confidential. If after the indictment the grand jury investigation had ended, any harm from exposure to the email already had occurred. It would make sense in those circumstances to hold off until after the criminal proceedings are over before determining whether the grand jury was tainted. That is because there could be no ongoing violations—*i.e.*, further use of the email by the grand jury—in the interim.

However, those are not our facts. Even after the indictment a newly empaneled grand jury continues to investigate Doe and may bring additional charges. In deciding whether to do so, it may make further use of the email that Doe is asking us to keep confidential. In our case, as in *Johanson*, the indictment "did not bring the grand jury's proceedings to [their] conclusion," so there is still potential harm we can prevent. *Johanson*, 632 F.2d at 1040. The purpose of this appeal thus remains the same as when it was first filed: deciding whether an email should be used as part of an ongoing grand jury investigation. Tellingly, both Doe and the Government agree that the appeal is not moot, and my colleagues do not take issue with that assessment. As a result, both *Johanson* and *Fattah* require us to reach the merits.

Instead of explaining why, despite our contrary case law, an indictment automatically cuts off jurisdiction that once existed and prevents us from deciding a live controversy, the majority looks at decisions that answer a different question: whether jurisdiction was ever proper under the collateral order rule. It relies primarily on a quote from

4

*Johanson*. That case involved two separate appeals. As discussed, one was filed by the Government, and we continued to exercise jurisdiction even after an indictment.

The second appeal was filed by the target of the grand jury investigation (who became an indicted defendant as the appeal was pending). Unlike the Government, the target did not have the benefit of a statute providing pre-indictment jurisdiction. Nor was *Perlman* available. Instead, the target relied exclusively on the collateral order rule. That doctrine allows us to hear an appeal of an interlocutory order that "(1) conclusively determine[s] the disputed question; (2) resolve[s] an important issue completely separable from the merits of the action; and (3) [is] effectively unreviewable on appeal from a final judgment." *Bines v. Kulaylat*, 215 F.3d 381, 384 (3d Cir. 2000) (internal quotation marks omitted). In explaining why the target could not meet the third requirement, we made the statement on which my colleagues rely: that "flawed grand jury proceedings can be effectively reviewed by this court and remedied after a conviction has been entered and all criminal proceedings have been terminated in the district court." *Johanson*, 632 F.2d at 1039.

The context for this statement makes all the difference. Importantly, we did not hold that we had jurisdiction under the collateral order rule before the indictment but lost it afterward. Instead, we concluded that we never had jurisdiction—even pre-indictment—to hear the target's interlocutory appeal. Our reasoning would have been the same had he never been indicted.[3]

---

[3] In a separate passage, we held that the target's appeal was also moot. *Id.* at 1039–40. This was in contrast to the Government's appeal, which still presented a live controversy. *Id.* at 1040. The case thus stands for the

So what is different here? In short, this case was never about the collateral order rule. From the outset it has been about *Perlman*. And in cases like ours, where jurisdiction was proper at the outset, we cannot say that deferred review is sufficient. If a post-trial appeal were a panacea, the statute that authorized the Government's immediate appeal in *Johanson* (18 U.S.C. § 3731) would not exist. And neither would *Perlman*. My colleagues, by acknowledging the possibility that *Perlman* may have applied when the appeal was filed, have effectively conceded that we cannot force Doe to wait. That is because the Supreme Court has instructed us to assume in *Perlman* cases that an appeal "at some other time" is not good enough. *Perlman*, 247 U.S. at 13.

At first glance it might seem incongruous to say that review of Doe's case after the criminal proceedings is sufficient under the collateral order rule but is not under *Perlman*. But there is a reason for this apparent anomaly, and it relates to *Perlman*'s origins. *Perlman* arose as an exception to the contempt rule. That rule applies when a privilege holder seeks review of an order to disclose information. It allows him to "disobey the court's [disclosure] order, be held in contempt, and then [immediately] appeal the contempt order" rather than having to wait until the end of the case. *See In re Grand Jury (ABC Corp.)*, 705 F.3d 133, 138 (3d Cir. 2012). Sometimes, however, this option is unavailable because the court order is directed exclusively at a disinterested third party who is in control of the privilege holder's documents. Because the privilege holder cannot

---

uncontroversial point that often an indictment will moot an appeal, but other times it will not. Here, as discussed, Doe's appeal falls into the latter category.

6

refuse to obey a court order to which he is not subject, *Perlman* allows him to take an immediate appeal. *Id.*[4]

When a litigant relies on the collateral order rule alone, there is a presumption that, having not stood in contempt, he does not truly believe the dispute is worth immediate review. After all, the purpose of requiring contempt is to make sure that only "momentous" and "consequential" issues get an expedited appeal. *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 112 (2009). However, when, as in *Perlman* cases, the contempt rule is unavailable, we do not know how strongly a party values the issue and how necessary prompt review is. As a result, we err on the side of caution and assume that an appeal after the trial is inadequate. *Perlman*, 247 U.S. at 13.

Our decision in *Fattah* is a prime example of these dynamics. Fattah argued that we had jurisdiction under both the collateral order rule and *Perlman*. We held that the collateral order rule did not apply because, among other considerations, any error that occurred was "reviewable upon appeal" after the criminal proceedings ended. 802 F.3d at 526. Even though post-trial review was sufficient for our analysis under the collateral order rule, we nonetheless concluded that *Perlman* allowed for an immediate appeal. *Id.* at 529.

_____

[4] My colleagues suggest that Doe could have availed himself of the contempt rule by getting the email from his accountant and then refusing to produce it. That suggestion would make sense if the subpoena had been directed at both Doe and the accountant. However, because it was addressed only to the latter, my colleagues' proposed solution goes beyond what our case law requires of an appellant. *See infra* n.1.

7

Similarly, in *ABC Corp.* we exercised *Perlman* jurisdiction even as we conceded that, had the case come to us under the collateral order rule, the "opportunity for post-conviction review" would have been sufficient. 705 F.3d at 145. We noted that *Perlman* and the collateral order rule are "separate" doctrines, meaning that the unavailability of the latter does not mean we cannot invoke the former. *Id.* at 145–46. This observation applies with equal force here.

Put another way, my colleagues' arguments persuasively demonstrate why we never at any stage of this case had jurisdiction under the collateral order rule. But the case law they cite, which does not turn on the presence or absence of an indictment, does not explain why, once jurisdiction is proper under a completely different theory (*Perlman*), we can be divested of our ability to decide a live controversy. As long as we had jurisdiction at the outset, Doe's case is governed by our analysis of the Government's appeal in *Johanson* and by our decision in *Fattah*. As in those cases, the indictment did not destroy jurisdiction that properly existed beforehand.

My colleagues have two responses to this critique. The first is their suggestion that *Perlman* itself was focused on pre-indictment jurisdiction. They note that the litigant in that case was attempting to prevent the "proposed use by the United States before the grand jury of [materials] as a basis for an indictment." *Perlman*, 247 U.S. at 13. However, if *Perlman* only applied pre-indictment, then we could not have relied on it in *Fattah*. Moreover, *Perlman* is not limited to grand jury matters or even to criminal cases. *See, e.g.*, *Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 671 F.2d 100, 103 (3d Cir. 1982) (applying *Perlman* in a civil case). It simply cannot be that a doctrine that also applies to civil lawsuits turns on whether there has been an indictment.

8

Next my colleagues, relying on the Seventh Circuit's decision in *United States v. Calandra*, 706 F.2d 225 (7th Cir. 1983), note that the grand jury already saw the email that Doe claims is privileged. In their view, this makes it futile to apply *Perlman*. They say that the "jurors cannot un-see that email any more than the proverbial bell can be un-rung." Maj. Op. at 16. However, this only applies to the first grand jury, which has already been discharged. As far as we are aware, the newly empaneled grand jury (the one that may charge Doe with additional offenses) has not yet seen it. Use of the email by this second, untainted grand jury is the outcome that Doe seeks to prevent. There is therefore no bell that needs to be un-rung.

In sum, my colleagues suggest that it is inappropriate for Doe to ask us to "peek into the merits" of his case at this early stage. *Id.* at 19. But that is what would have happened had we decided the case before the indictment. I know no reason for taking a different approach now.

## II.

My colleagues also argue that their position promotes judicial efficiency, as forcing parties to wait until final judgments "minimizes . . . opportunities to defeat . . . valid claims . . . through an endless barrage of appeals." *In re Grand Jury Subpoena*, 190 F.3d 375, 379 (5th Cir. 1999). And they observe that, "[t]o be effective, judicial administration must not be leaden-footed. Its momentum would be arrested by permitting separate reviews of the component elements in a unified cause." *Cobbledick v. United States*, 309 U.S. 323, 325 (1940).

The problem is that these are arguments for why we should not have had jurisdiction at the outset of this appeal. When we are able to dismiss an appeal for lack of jurisdiction

9

as soon as it is filed, we achieve the benefits the majority notes. Specifically, the process continues uninterrupted in the trial court, and we are able to wait until all the appellate issues are neatly wrapped in a bow for us after a final judgment.

The same does not hold true here. Even under my colleagues' approach, we will continue to accept pre-indictment *Perlman* appeals. And, once we take them, we must begin to decide them, knowing all the while that we might have to put our pencils down at any moment if there is an indictment. Consider our case, which has been on our docket since June 2015. By the time Doe was indicted nearly ten months had passed, and the parties had fully briefed the case and presented oral arguments to us.

We must now disregard all of this and send the case back to the District Court. However, there is a very real possibility that it will be back. For instance, if Doe is convicted and files an appeal, the parties will need to re-brief and re-argue the same issue that we could have resolved already. And if we agree with Doe at that time, we may need to order a new trial (*but see infra* Part III)—another result that could have been avoided. Thus, in cases where we accept an appeal when it is filed, efficiency favors finishing what we started.

In response, my colleagues say that we "can only speculate" as to whether the issue will be back in front of us a second time. Maj. Op. at 20. If the potential harm truly were too speculative, we would have dismissed Doe's appeal as moot. *See, e.g.*, *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1117 (10th Cir. 2010) ("A case ceases to be a live controversy if the possibility of recurrence of the challenged conduct is only a speculative contingency.") (internal quotation marks and alteration omitted). As

10

discussed, the parties agree that the existence of the second grand jury means that the possible harm to Doe is not too speculative, and my colleagues do not challenge that assessment. They cannot have it both ways. If the controversy is live enough that the case is not moot, we should decide it.

## III.

Having dismissed the appeal for lack of jurisdiction, my colleagues were not permitted to reach the substance of Doe's appeal. Because I disagree with their conclusion, however, I am not similarly constrained. On the merits, I would reverse the District Court and conclude that the crime-fraud exception to the attorney work product doctrine does not apply to the email at issue. In particular, I believe that one of the exception's two requirements—the use of the communication in furtherance of a fraud—is lacking. The use-in-furtherance requirement provides a key safeguard against intrusion into the attorney-client relationship, and I am concerned that the District Court's reasoning erodes that protection.

The introduction to the majority opinion provides much of the relevant background. To recap briefly, Company A was a defendant in a class action lawsuit. The plaintiffs in the suit were talking about trying to pierce the corporate veil. That means that, in addition to going after Company A's assets, they would attempt to hold the owner of the company personally liable. The Government's theory is that Doe owned Company A but tricked the plaintiffs into thinking that he had sold it to a business associate. The Government alleges that the reason for this deceit was to encourage the plaintiffs to settle for a lower value. This relies on the premise that, while Doe has deep pockets, the business associate does not.

11

While the lawsuit was pending, Doe's attorney sent him the email at the heart of this appeal. The attorney wrote that, although there was a "good faith transfer" to the business associate, Doe's tax returns did not reflect the change in ownership. The email noted that, in order to "correct the record as best we can at this stage," it "would be helpful" for Doe's accountant to "correct [the] tax returns" by retroactively amending them. Doe then forwarded the email to his accountant and said, "Please see the seventh paragraph down re; [sic] my tax returns. Then we can discuss this." There is no evidence that Doe ever amended his returns or did anything else, apart from forwarding the email, to follow up on his attorney's suggestion. The accountant's recollection is that Doe's attorney later said not to go through with the amendments. The lawyer told the accountant to "stand by" for further guidance, which never came.

Everyone agrees that, barring the application of the crime-fraud exception, the email from Doe's lawyer is protected by the attorney work product doctrine. That doctrine, which is the sibling of the attorney-client privilege, preserves the confidentiality of legal communications prepared in anticipation of litigation. Shielding work product from disclosure "promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991). Though Doe waived the attorney-client privilege by forwarding the email to his accountant, the document still retained its work product status. *See id.*

Work product protection, though fundamental to the proper functioning of the legal system, is not absolute. As relevant here, the crime-fraud exception operates to prevent the perversion of the attorney-client relationship. It does so by allowing disclosure of certain communications that would

otherwise be confidential. "[A] party seeking to apply the crime-fraud exception must demonstrate that there is a reasonable basis to suspect (1) that the [lawyer or client] was committing or intending to commit a crime or fraud, and (2) that the . . . attorney work product was used in furtherance of that alleged crime or fraud." *ABC Corp.*, 705 F.3d at 155.

The Government can readily satisfy the first requirement. Though ultimately it will be up to a jury to determine whether Doe committed fraud, there is at least a reasonable basis to believe he did. Even setting aside the email, the Government has a recording where Doe allegedly brags about defrauding the class action plaintiffs. He purportedly admits in that recording to telling his associate— the same one who was supposed to have already purchased Company A—"I'll pay you ten grand a month if you will step up to the plate and say that you [own the company] and upon the successful completion of the lawsuit [I'll] give you fifty grand."

This evidence is strong, but it is not sufficient by itself to pierce the work product protection. We have been clear that "evidence of a crime or fraud, no matter how compelling, does not by itself satisfy both elements of the crime-fraud exception." *In re Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. 2011). Rather, the second requirement—use in furtherance— exists for the same reason that certain conspiracy statutes require proof that a defendant engaged in an overt act to further the crime. In both settings we want to make sure that we are not punishing someone for merely thinking about committing a bad act. Instead, as Justice Holmes noted in the conspiracy context, we ask for evidence that the plan "has passed beyond words and is [actually] on foot." *Hyde v. United States*, 225 U.S. 347, 388 (1912) (Holmes, J., dissenting).

13

In that sense, requiring an act in furtherance distinguishes between situations where the attorney-client relationship works and those where it malfunctions. For instance, if a client approaches a lawyer with a fraudulent plan that the latter convinces the former to abandon, the relationship has worked precisely as intended. We therefore reward this forbearance by keeping the work product protection intact. If, by contrast, the client uses work product to further a fraud, the relationship has broken down, and the lawyer's services have been "misused." *In re Grand Jury Investigation*, 445 F.3d 266, 279 (3d Cir. 2006). Only in that limited circumstance—misuse of work product in furtherance of a fraud—does the scale tip in favor of breaking confidentiality.

Here the only purported act in furtherance identified by the District Court was Doe forwarding the email to his accountant. If Doe had followed through and retroactively amended his tax returns, I would have no trouble finding an act in furtherance. Even if he had told the accountant to amend them and later gotten cold feet and called off the plan, there would still be a case to be made. That is because the Government "does not have to show that the intended crime or fraud was accomplished, only that the lawyer's advice or other services were misused." *Id.* (quoting *In re Public Defender Serv.*, 831 A.2d 890, 910 (D.C. 2003)).

As it is, however, none of that happened. Doe merely forwarded the email to the accountant and said he wanted to "discuss" it. There is no indication that he had ever decided to amend the returns, and before the plan could proceed further the lawyer apparently pulled the plug by telling the accountant to hold off. Thus Doe at most thought about using his lawyer's work product in furtherance of a fraud, but he never actually did so. What happened here is not so different from Doe merely writing a private note, not sent to anyone,

14

reminding himself to think about his lawyer's suggestion. The absence of a meaningful distinction between these scenarios shows why finding an act in furtherance here lacks a limiting principle and risks overcoming confidentiality based on mere thought.

The District Court gave two reasons for its conclusion that Doe used his lawyer's work product in furtherance of a fraud. Both are flawed. First, the Court suggested that Doe, in forwarding the email to his accountant, "took [his lawyer's] advice" about amending the tax returns. Joint Appendix 16. It is not clear what the Court meant by this because, as it acknowledged, Doe "never followed through with amending" the returns. *Id.* Second, the Court said that the failure to follow through "is of no consequence" as long as Doe intended, as of the time he forwarded the email, to amend the returns. *Id.* This is no doubt an accurate statement of the law. *See ABC Corp.*, 705 F.3d at 155. The problem is that there is simply no record evidence suggesting that Doe had ever made up his mind.

None of this suggests that, in the event Doe is convicted and appeals, he should automatically get a new trial based on the Government's use of protected work product. That is because the Government could avoid a retrial by showing the error was harmless. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255–56 (1988). I express no opinion on this harmlessness question.

15

\*　　\*　　\*　　\*　　\*

Many grand jury appeals will become moot after the return of an indictment. Indeed, the presence of a new grand jury that is continuing to investigate makes this case out of the ordinary. But where, as here, a live controversy remains, an indictment should not automatically preclude us from deciding it. The majority, however, has crafted a rule that risks divesting us of jurisdiction in all *Perlman* cases where there is an indictment, even ones where our pre-indictment jurisdiction is ironclad. I believe this rule is foreclosed by our precedent and, in any event, is counterproductive. It also has the unfortunate effect of preventing us, at least for the time being, from correcting what I view as a mistaken decision on the merits. I therefore respectfully dissent.